490 A.2d 1377

**COMMONWEALTH of Pennsylvania**

v.

**Pasquale MANCINI, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 12, 1984.

Filed March 29, 1985.

William F. Fox, Jr., Norristown, for appellant.

J. William Ditter, III, Assistant District Attorney, Norristown, for Commonwealth, appellee.

Before McEWEN, DEL SOLE and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from the judgment of sentence which was imposed upon appellant, Pasquale Mancini, after he was convicted by a jury of burglary [1] and criminal conspiracy.[2] We affirm.

Appellant raises the following issues: (1) whether the trial court erred in granting the prosecution's petition for an extension of time to commence trial; (2) whether the evidence obtained from the search of appellant's vehicle and the statement elicited from the appellant should have been suppressed; (3) whether the prosecution failed to prove the corpus delecti of the charge of conspiracy which should have precluded it from introducing appellant's confession; (4) whether the evidence of burglary was against the law; and (5) whether the trial court erred in failing to question the appellant and his counsel to determine if irreconcilable differences existed between them. The appellant also contends that trial counsel was ineffective (a) for failing to advise appellant adequately on whether he should testify in his own defense at trial; (b) for failing to introduce a toxicology report and for failing to interview and call certain witnesses at appellant's suppression hearing; (c) for failing to file an answer to the prosecution's petition for an extension of time to commence trial; and (d) for failing to move for a mistrial when a prosecution witness, Officer Corbin, expressed a personal opinion on the guilt of the appellant during direct examination.

For the most part, appellant's contentions were addressed adequately by the trial court. The record also shows that

1. 18 Pa.C.S. § 3502.
2. 18 Pa.C.S. § 903.

an evidentiary hearing was conducted on appellant's ineffectiveness of counsel claims. This appeal followed.

The facts surrounding the suppression issue which appellant raises were summarized by the trial court as follows:

On November 5, 1981, the residence of David Homiller was burglarized on Norristown Road, Springhouse, Montgomery County. During the burglary, various items including sixty (60) cassette tapes in a black case, stereo equipment, and jewelry were stolen.

On November 7, 1981, Officer Corbin of the Telford Borough Police Department was investigating a hit and run accident. Subsequent to his arrival at the scene of the accident, Officer Corbin received information that the striking automobile was located in the Telford Municipal Parking Lot. Officer Corbin proceeded to the parking lot and found a charcoal black 1966 Chevrolet bearing Pennsylvania license registration number DEW–504.

The officer examined the exterior of the automobile, which matched the radioed description, and found fresh front end damage. The officer also could see that the interior of the car was littered with beer cans and a black tray containing several cassette tapes. An investigation revealed that the automobile was driven by the appellant.

Earlier in the day, on November 7, 1981, Raymond Federsel, an off-duty police officer from the Borough of Telford, had observed the black Chevrolet hop a curb and sideswipe a parking sign. Three males alighted from the vehicle and began to flee. The driver of the automobile was carrying a can of beer and headed in the direction of Officer Federsel. Federsel stopped the driver and requested some identification. The driver of the vehicle identified himself as Pasquale Mancini and also stated that he was twenty (20) years of age.

At that time, Officer Federsel, who was off-duty and in plain clothes, presented his identification badge, advised appellant of his constitutional rights, and detained the suspects for the crime of underage drinking.

598

At the police station, Officer Corbin proceeded to run a routine records check for any outstanding warrants against appellant.

Detective Kenneth Bright of the Lower Gwynedd Police Department responded to this record inquiry and informed Officer Corbin of the burglary two days earlier. Detective Bright stated that Mr. Mancini was a suspect and requested to view the automobile and question the appellant.

At approximately six-thirty on the evening of November 7, 1981, Detective Bright, along with the victim, David Homiller, arrived at the Telford Police Station. Detective Bright then explained to the appellant the intentions of the officers and their desire to search his vehicle. The appellant read a Consent to Search form and then signed his name.

After thirty minutes of explanation, the appellant, Officers Corbin and Federsel, along with Detective Bright and the victims, proceeded to search the vehicle. The cassette tapes and the jewelry were positively identified by the victims as belonging to them.

Appellant was placed under arrest, but later released into the custody of his father. The appellant and his father, accompanied by appellant's uncle, then drove voluntarily to the Lower Gwynedd Police Station. After being advised once again of his *Miranda* rights, the appellant confessed to his role in the Homiller burglary.

Both the prosecution and the appellant agree that the appellant's arrest by Officer Federsel for underage drinking was illegal. This arrest was illegal because the police officer was off duty during the time that appellant was arrested for the summary offense. *See Commonwealth v. Stahl,* 296 Pa.Super. 507, 512–514, 442 A.2d 1166, 1169 (1982) (plurality opinion); *See also* 18 Pa.C.S.A. § 6308 ("A person commits a *summary* offense if he, being less than 21 years of age, attempts to purchase, purchases, consumes, possesses or transports any alcohol, liquor or malt or brewed beverages.") (Emphasis added).

Under our rules, "a *citation* shall be issued to the defendant by a police officer who shall be in uniform or display a badge or other sign of authority, when the offense charged is any other violation of an ordinance or summary offense." Pa.R.C.P. 51 (A)(3)(a). (Emphasis added). Because the record fails to establish that these procedures were followed, appellant's arrest is illegal. This is because "a private citizen [or off duty out of uniform police officer] may not make an *arrest* for a summary offense." *Commonwealth v. Stahl*, 296 Pa.Super. at 515, 442 A.2d at 1170 (emphasis added) (where an out of uniform off duty "officer was not acting within the scope of his employment ... [he] was merely acting, in effect, as a doorman, a private citizen without authority in these circumstances to effectuate any type of arrest for a summary offense.")

However, notwithstanding the fact that the initial arrest was illegal, the prosecution argues that "[t]he only effect of this illegal arrest was to expedite the capture of the defendant." Brief for the Prosecution at 16.

■ We recognize that

[t]he relevant test for determining whether a confession following an illegal arrest must be suppressed is:

> "... 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" (Citations omitted.)

*Wong Sun v. United States*, supra, 371 U.S. [471] at 488, 83 S.Ct. [407] at 417 [9 L.Ed.2d 441 (1963)]; accord, *Brown v. Illinois*, supra, 422 U.S. [590] at 597, 95 S.Ct. [2254] at 2259 [45 L.Ed.2d 416 (1975)]; *Commonwealth v. Bruno*, 466 Pa. 245, 255, 352 A.2d 40, 45 (1976); *Commonwealth v. Whitaker*, 461 Pa. 407, 412, 336 A.2d 603, 606 (1975); *Betrand Appeal*, supra, 451 Pa. [381] at 381, 303 A.2d [486] at 490 [ (1973) ]. The challenged confession may be purged of the primary taint only if (1) it results from an intervening act of free will which is free of any element of coerciveness due to the unlawful

arrest, or (2) the connection between the arrest and the confession has become so attenuated as to dissipate the taint. *Commonwealth v. Whitaker,* supra, 461 Pa. at 414–17, 336 A.2d at 607–08; *Betrand Appeal,* supra, 451 Pa. at 388–89, 303 A.2d at 490; *Commonwealth v. Bishop,* 425 Pa. 175, 183, 228 A.2d 661, 666, cert. denied, 389 U.S. 875, 88 S.Ct. 168, 19 L.Ed.2d 159 (1967); see *Wong Sun v. United States,* supra, 371 U.S. at 486, 491, 83 S.Ct. at 416, 419. Moreover, once the illegal arrest has been established, the Commonwealth has the burden to establish that the confession "has been come at 'by means sufficiently distinguishable to be purged of the primary taint' ...." *Betrand Appeal,* supra, 451 Pa. at 389, 303 A.2d at 490.

*Commonwealth v. Farley,* 468 Pa. 487, 496–497, 364 A.2d 299, 303 (1976).

More specifically, our Supreme Court

has enumerated two factors of major significance in determining the relationship between the illegal arrest and subsequent confession:

" '(a) the proximity of an initial illegal custodial act to the procurement of the confession; and

(b) the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest.' "

*Betrand Appeal,* supra [451 Pa.] at 389, 303 A.2d at 490 (quoting from *Commonwealth ex rel. Craig v. Maroney,* 348 F.2d 22, 29 (3d Cir.1965), cert. denied, 384 U.S. 1019, 86 S.Ct. 1966, 16 L.Ed.2d 1042 (1966)).

*Id.*

■ When these standards are applied to the instant case, we conclude that the confession was obtained by means "sufficiently distinguishable to be purged of the primary taint."

The record shows that there were intervening events which attenuated the taint.

At the time that appellant was arrested at the station, the police were looking for a vehicle which was used in a hit and run accident. (N.S.T. 16) On November 7, 1981, at 4:40 p.m., the police received an anonymous call which stated that a "mid-sixties", "black Chevrolet in beat up condition, with left front end damage" was the "striking vehicle" in a hit and run accident and was "last seen north on School Lane." (N.S.T. 32) Officer Corbin also received information that the caller had followed the vehicle to the Municipal Parking Lot. Corbin went to the location and found "a 1966 Chevrolet bearing Pennsylvania registration DEW–504 parked at the railroad tracks on the north side of the parking lot," which was unoccupied. (N.S.T. 33) When Officer Corbin approached the vehicle, he "confirmed the fact that it had fresh front end left side damage." (*Id.*) The officer also "looked inside the vehicle, and noted several containers of beers, open and closed, also noted a large black tray containing a large amount of cassette tapes in the back right floor of the car, and some stereo equipment." (*Id.*) As Corbin approached the car, he got a radio message to return to the station, which was one hundred (100) yards from the parking lot.

After Corbin arrived at the station, he saw the appellant and two white males with Officer Federsel. Corbin advised the appellant of his rights since he was the officer on duty. Appellant stated that he wanted to speak to the officer about "the hit and run accidents." (N.S.T. 37) As a matter of routine procedure, Officer Corbin called the Ambler police department, which was appellant's hometown. Corbin was told by Detective Ken Bright that a burglary had occurred a day or two before and that a black tray was taken containing a large quantity of cassette tapes. Corbin advised Detective Bright of what he had seen in the car.

At 7:20 p.m., appellant signed a permission to search form and the victims of the burglary came to the station and identified the items in the car. Appellant denied knowledge

and stated that the tapes "weren't stolen." (N.S.T. 47) Appellant spoke to his father for one half hour and was released at midnight.

Appellant phoned the police station in Ambler after his release and Detective O'Connor told appellant to come to the station. Appellant, appellant's father and his uncle went to the police station. Detective O'Connor had known appellant because he had been appellant's juvenile officer. O'Connor advised appellant of his *Miranda* rights as he had "many times on prior arrest occasions." (N.S.T. 72) Appellant indicated that he "did not want the presence of an attorney." (N.S.T. 73) Appellant executed a written waiver in the presence of his father and his friend and gave the detective a written confession. After appellant gave his confession, he was released and was not arrested until approximately three months later in Tempe, Arizona.

Thus, appellant's release from the police station and his visit to another police station with his father and uncle during which time appellant confessed to the crime was "an intervening act of free will which [was] free of any element of coerciveness due to the unlawful arrest." *Commonwealth v. Farley*, 468 Pa. at 496, 364 A.2d at 303.

■ Additionally, the evidence which was seized from the car was not tainted by the illegal arrest. The record shows that an eyewitness identified appellant's vehicle as the striking vehicle in a hit and run accident. After an independent examination, Officer Corbin discovered appellant's vehicle in the Municipal lot. These events were independent from those which led to appellant's illegal arrest for underage drinking.

When appellant was taken to the police station, he consented to the search of his vehicle. Although appellant had been drinking beer, the prosecution's evidence established that appellant was capable of making an informed decision. Under these circumstances, the prosecution has met its burden of showing that the evidence was not tainted by the illegal arrest.

■ In determining whether the consent which was given by appellant after his arrest was valid, we have applied certain guidelines. Although the fact that appellant was under arrest is a relevant factor to consider, we recognize that "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 423, 96 S.Ct. 820, 828, 46 L.Ed.2d 598, 609 (1976). *Accord Commonwealth v. Dressner*, 232 Pa.Super. 154, 155–157, 336 A.2d 414, 415 (1975). Instead, we have said that " '(t)he issue of whether consent has been voluntarily given is a question of fact which must be determined in each case from the totality of the circumstances.' " *Commonwealth v. Walsh*, 314 Pa.Super. 65, 74, 460 A.2d 767, 771 (1983) (*quoting Commonwealth v. Watkins*, 236 Pa.Super. 397, 399, 344 A.2d 678, 679 (1975)). *Accord Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Additionally, this Court has been "properly reluctant to examine the facts and circumstances *de novo* without giving due weight to the advantage the hearing court has had by observing the demeanor of the witnesses and the defendant." *Commonwealth v. Dressner*, 232 Pa.Super. at 157, 336 A.2d at 415 (emphasis in original).

Some of the relevant factors which we have considered as mitigating factors are (1) if the defendant's background indicates his understanding of investigating procedures or his understanding of his constitutional rights, *Id.;* (2) if the suspect has aided an investigation or search, as by providing a key, *Id.;* (3) if the consenter believed the evidence to be so well concealed that it probably would not be discovered, *Id.;* (4) the fact of some prior cooperation by the consenter which produced no incriminating evidence, *Id.;* (5) if the consenter was advised of his constitutional rights prior to giving his consent, *Id.;* (6) if the suspect felt that the best course of conduct was cooperation given the fact that he had been caught virtually "red-handed", *Commonwealth v. Griffin*, 232 Pa.Super. 163, 169, 336 A.2d 419, 421 (1975); and (7) the presence of probable cause to arrest or

search the suspect, *Commonwealth v. Thompson*, 292 Pa. Super. 108, 113–114, 436 A.2d 1028, 1031 (1981).

On the other hand, some of the aggravating factors which have militated against a finding that the consent was voluntary have been: (1) that the defendant was interrogated numerous times while the defendant was in custody for hours, *Commonwealth v. Smith*, 470 Pa. 220, 228–229, 368 A.2d 272, 277 (1977) (a defendant was questioned while in custody for twelve hours); (2) that the police used express or implied threats to obtain the defendant's consent, *Id.;* (3) that the defendant acquiesced in an order, suggestion, or request of the police, *Id.;* and (4) the lack of probable cause to arrest or search the subject, *Commonwealth v. Thompson, supra.*[3]

■ In reviewing the suppression court's findings, we are mindful of our responsibility to determine whether they are supported by the record. *See Commonwealth v. Jackson*, 497 Pa. 591, 595–596, 442 A.2d 1098, 1100 (1982). Additionally, we must consider the prosecution's evidence and so much of the defendant's evidence which remains uncontradicted, *Id.* When so viewed, we conclude that the appellant's consent was valid.

■ The suppression court entered the following relevant findings:

The defendant was in custody. His *Miranda* Warnings were provided him orally and, likewise, in writing. The defendant signed the written rights form. Immediately thereafter, he was presented with a consent, he having orally agreed to a search of his vehicle. And he signed a

---

3. A well-known commentator also has suggested some additional aggravating factors. These are: "(1) that the arrest occurred late at night; (2) that the arrest was made with a display of weaponry; (3) that the arrest was made by a forcible entry; (4) that the arrestee was placed in cuffs or otherwise kept under close restraint after his arrest; (5) that in a search incident to an arrest the police gained custody of a key or similar means of entry to the place they are asking to search; and (6) that the custody was used as leverage, in the sense that the arrestee was told that he would be released if he gave consent." LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 8.2.

written consent form to search his car, the black Chevrolet that we have been considering.

It is the Court's view that where a party is in custody the consent must be preceded by the *Miranda* Warnings. And that is precisely what took place here. *Miranda* Warnings are appropriate. And the consent is sufficiently specific.

On the question of the competency of the defendant to execute the consent, I believe, as has been suggested by the testimony, that this defendant had been drinking that day and, perhaps, as he suggests, a combination of Jack Daniels and beer. It may well be that he was—that he had likewise imbibed some drugs. He mentioned specifically Valium and Quaaludes. In any event, though I believe he had been drinking, I believe the officers' testimony—and two officers testified to this—that he understood where he was, that he understood what he was doing, that he had an awareness of his whereabouts and what was taking place, and that he was competent to execute the consent form.

There was no duress. There was no compunction. There was no force. There were no threats. The consent was purely and unequivocally voluntary. Accordingly, I find that the consent to search the vehicle is a valid consent.

This is a search which took place after the parties arrived; it revealed, of course, the evidence that is the subject of this proceeding. And I find it to be admissible for the reasons I have already indicated. I think it should also be indicated that in addition to the testimony of Officers Federsel and Corbin, who felt that the defendant was competent, it is perhaps most important to note that Detective Kenneth Bright of the Lower Gwynedd Police, who went to Telford on that evening, and who had previously known the defendant for some years, testified that, in his judgment, this defendant was perfectly normal. He said that he is always high strung, or hyper, if you will, but that he was no more so on this evening than

on any other occasions when he would talk to him. That would lend corroboration to the fact that though the defendant had been drinking and there was almost surely an odor of alcohol on his breath, particularly from the beer, nevertheless, he was not under the influence and not thereby rendered incompetent. The evidence found in the vehicle, the tapes, pillow case, and jewelry, which, as I understand it, included an earring, a unicorn, and a Kennedy dollar with a hole in it, are admissible, as having been properly recovered pursuant to the consentual [sic] search.

N.S.T. at 112–115.

We have reviewed the record and conclude that the suppression court's findings are supported by the record.

There were no overt or covert threats of force which were made against appellant. The record shows that appellant arrived at the police station at 5:00 P.M. Fifteen minutes later, appellant was advised of his rights and was asked to present identification. Officer Corbin then contacted the police station in appellant's hometown for information. According to Corbin, they "took quite a bit of time explaining everything, making sure he understood what, in fact, he was doing." N.S.T. at 44. Although the facts concerning the physical layout of the police station are less than clear, the record shows that appellant was with his two friends for at least part of the time, in the main police room and also shows that appellant was questioned by the police officers. The police explained to appellant that they wanted to search appellant's car in order to determine if items which the police believed to be stolen were in there. Appellant also was told that the victims of the burglary would accompany the police to the scene of the car. Appellant, a streetwise individual, who had prior encounters with the police, then said "there is no problem, there is nothing stolen in the vehicle, (the police) can check the whole thing...." N.S.T. at 43. Then appellant signed the consent form, which was at approximately 7:20 P.M. Under these circumstances, appellant's consent was valid. *See*

*Commonwealth v. Pytak*, 278 Pa.Super. 476, 488, 420 A.2d 640, 646 (1980) ("If the consenter believes that the evidence is unlikely to be discovered, the consent was probably voluntary.") *See generally* Annotation, 9 A.L.R.3d 858 (1966).

We also note that although the initial arrest was illegal, probable cause arguably existed at the time that appellant was taken to the police station because an eyewitness identification and subsequent police investigation had disclosed independently that appellant was involved in a hit and run accident and was operating a vehicle under the influence of alcohol. 75 Pa.C.S.A. § 3731(c) (warrantless arrest for drunken driving when based upon probable cause is authorized "regardless of whether the alleged violation was committed in the presence of such officer."); *See also Commonwealth v. Levesque*, 469 Pa. 118, 364 A.2d 932 (1976) and *Commonwealth v. Trefry*, 249 Pa.Super. 117, 375 A.2d 786 (1977).

With respect to the issues of trial counsel's ineffectiveness, we note that these issues were preserved because this is the first opportunity which appellant has had to raise trial counsel's stewardship. *Commonwealth v. Boyer*, 298 Pa.Super. 159, 444 A.2d 709 (1982).

The first issue appellant raises regarding trial counsel's ineffectiveness is that counsel failed to advise him of the alternatives in a defendant's decision to take the stand and testify on his behalf.

Of course, the standard to apply in reviewing an ineffectiveness claim is a two prong test. It is only when we have determined that the underlying issue is of arguable merit that we need assess whether counsel's action had a reasonable basis which was designed to effectuate the client's interests. *Commonwealth v. Courts*, 315 Pa.Super. 108, 461 A.2d 820 (1983).

We recognize that a defendant's decision of whether to testify at trial on his behalf is to be made ultimately by the accused after full consultation with counsel. *Common-*

■■■■■■■■■

*wealth v. Thomas*, 279 Pa.Super. 413, 419–420, 421 A.2d 267, 270 (1980). The following portions of the record shows that appellant's counsel fully consulted with him:

> Q. Basically, the statement said that he took an individual to the scene and the individual got out of the car and he didn't know what that individual was doing?
>
> A. Right.
>
> Q. Okay. And that's basically the version that Mr. Mancini told you?
>
> A. Right.
>
> Q. Did you consider or advise him that since that was his defense it might be advisable for him to take the stand?
>
> A. No, I didn't advise him to take the stand.
>
> Q. Did you advise him not to take the stand?
>
> A. No, I did not.
>
> Q. What did you advise him?
>
> A. *I discussed with him—I asked Pasquale whether he wanted to take the stand. I said that if you take the stand you would be testifying that you drove so and so to—whatever is the co-defendant's name—to the scene of the crime, you would also be open to cross-examination.*
>
> *And Pasquale indicated that he did not wish to take the stand. At the conclusion of the Commonwealth's case and after my motions on demurrer were not granted, I discussed briefly with Pasquale whether he wanted to take the stand, and he said, "No, no way." Pasquale also, as I understand it, is familiar with the criminal process, and he knew that*
>
> —

> MR. FOX: I object to that, Your Honor. That was uncalled for.
>
> THE COURT: It's certainly a true statement, Mr. Fox. He has a long and infamous record in this court.
>
> MR. FOX: That may be the case, Your Honor, but it wasn't responsive to my question.

BY MR. FOX:

Q. So, basically, then, you have testified that you didn't advise Mr. Mancini one way or the other, you didn't advise him to take the stand and you didn't advise him not to take the stand?

A. *No, I usually—I don't make that decision for my clients. I put it out to them—the possibility of taking the stand out to them and they are the ones who decide whether they want to testify.*

Q. Did you advise Mr. Mancini which method or which course of action you thought had the best chance of success?

A. No, I did not.

Q. Did you have an opinion as to which course of action had the best chance of success?

A. Yes, I did.

Q. Which course of action was that?

A. I didn't think that Mr. Mancini would help his case if he did testify.

Q. And why did you so conclude?

A. Because I thought that he would have a difficult time explaining the existence of the tapes and the other merchandise in the car, the pillow case or whatever in his car, if the other person had committed the burglary when—

Q. But those items were already in evidence at the trial, were they not?

A. That's correct.

Q. So they were there to damn him, anyway. Would it not have been better to put him on the stand and let him try to explain it away?

A. If he wanted to take the stand, he had the opportunity to take the stand.

Q. No. In your professional opinion as an attorney, would it not have been better to put him on the stand to let him try to explain it away since they were already in evidence?

A. Yes, I think that it would have been to his advantage to take the stand to explain those—to explain that away. However, if Mr. Mancini took the stand and if his testimony—if there were a lot of contradictions in his testimony as a result of cross-examination by the District Attorney, I would think that that would hurt his case more.

Q. Of course, any witness who takes the stand is subject to cross-examination.

A. That is correct.

Q. And you, as an attorney, would advise Mr. Mancini of—as you would any client, I assume—how to—what to watch out for in cross-examination, what tricks?

A. That is correct. And I also advise my clients or discuss the inconsistencies between the statements that they give and physical evidence.

Q. Actually, though, Mr. Mancini's statement was very consistent with what he would have testified to had he taken the stand, was it not?

A. Yes, on direct examination.

Q. So the—basically, your greatest fear was cross-examination?

A. Yes.

(Evidentiary Hearing, pp. 35–38) (Emphasis added)

Thus, appellant's decision not to testify on his behalf was made after full consultation; consequently, appellant must bear the burden of his decision not to testify and cannot shift the blame to his attorney. *Commonwealth v. Thomas*, 279 Pa.Super. at 419–420, 421 A.2d at 270.

■■■■■■ Appellant next contends that trial counsel was ineffective for failing to introduce a toxicology report and for failing to call certain witnesses at appellant's suppression hearing. We disagree.

According to appellant, these witnesses would have established that "the statement and the consent to search were not voluntarily given because the defendant was under the influence of drugs and alcohol to such a degree as to

severely impair his mental capacities." Brief for Appellant at 30.

We recognize that counsel should explore alternatives of "casting a shadow upon the Commonwealth's witnesses truthfulness." *Commonwealth v. Guerrisi*, 297 Pa.Super. 245, 250, 443 A.2d 818, 821 (1982). However, the record shows that counsel's decision in this area was a tactical one. Appellant's counsel testified to the following:

Q. Were you also aware at that time that, basically, based on the evidence that you presented at the suppression hearing was Mr. Mancini's word against the police officer's word?

A. Yes.

Q. And is it true that the officers who testified—I think it was all three of them—testified that Mr. Mancini, to the best of their opinion, did not appear to be under the influence of alcohol or drugs?

A. Yes.

Q. So Mr. Mancini's position was inconsistent with the officers' positions?

A. That is correct.

Q. You had something in your possession, the toxicology report prepared by a third party independent witness which supported Mr. Mancini's position?

A. That is correct.

Q. You chose not to introduce that report; is that correct?

A. Yes.

Q. Why?

A. I subpoenaed the toxicologist in this case, Dr. Paul Schweda. My detective served Dr. Schweda twice with the subpoena. On the morning of the hearing Dr. Schweda did not arrive at the courthouse, and prior to lunchtime I requested—I asked the judge for an opportunity to try to locate Mr. Schweda to bring him in to testify on behalf of Mr. Mancini. In any event, when I spoke to Mr. Schweda, he advised me that he was the

only toxicologist in the lab that day and that it would be very difficult for him to leave. I then asked him about the testimony that he would be giving at the suppression hearing, and *Mr. Schweda indicated to me that although Mr. Mancini would have been under the influence of drugs or alcohol, that the amounts in his system would not have prevented him from understanding any questions that would have been put toward him, and that he would have been able to understand anything which was said or asked of him, and that he would have been coherent enough to understand anything that was happening to him.*

\* \* \* \* \* \*

Q. Your client had admitted to being at the scene of the burglary and, in fact, had the tapes in his car; is that correct?

A. Yes.

Q. And you knew that the only way probably to suppress it would be to show that he did not consent to the statement; is that right?

A. Yes.

Q. And the Commonwealth had three police officers who had observed the defendant; is that correct?

A. Yes.

Q. And you presented the defendant himself?

A. Yes.

Q. The other people mentioned by Mr. Fox, two people in the car, the victim of the original accident, and Dr. Schweda, would they have added anything to what the defendant could testify himself?

MR. FOX: Objection, Your Honor. She couldn't possibly know because she never interviewed them.

MRS. KILLINGER: I think she can answer it.

THE COURT: I think she can, too.

THE WITNESS: I don't think they would have added anything except possibly Dr. Schweda, and I thought that his testimony would have been damaging.

Evidentiary Hearing at 16–17, 40–41 (emphasis added)

Additionally, trial counsel stated that the police officer's testimony admitted that appellant had consumed drugs and alcohol. *Id.* Thus, the police officers did corroborate appellant's claim that he had symptoms of imbibing in alcohol. As a result, counsel's strategy not to call certain witnesses had a reasonable basis because the toxicology report would have damaged appellant's claim and the other testimony would have corroborated the details already set forth by the police.

 Trial counsel also was not ineffective in failing to use a peremptory challenge on a juror whom appellant instructed to strike and in using a peremptory challenge on a juror whom appellant instructed her to keep.

Trial counsel testified that initially appellant wanted to strike a juror who was acquainted with the District Attorney. Defense counsel advised appellant that in her opinion she "did not think that [the juror] would hurt his case." *Id.* at 23. At that point, appellant shrugged his shoulders which counsel interpreted as acquiescence.

With respect to the juror whom appellant claims should not have been stricken, the record shows that neither defense counsel nor the prosecution struck the juror. Instead, because of the sequence of names which appeared on the list, this juror was an alternate juror, who was excused at the end of the trial. Thus, appellant's claim does not afford him a basis for relief because he has failed to allege how he was prejudiced by counsel's stewardship.

 Appellant also claims that trial counsel was ineffective for failing to file an answer to the prosecution's petition to extend the time for trial.

This issue also is without merit because appellant had testified during a previous hearing that he was a fugitive and was unavailable for trial during the relevant time period. Counsel cannot be found ineffective for failing to assert a baseless claim. *Commonwealth v. Evans*, 489 Pa. 85, 413 A.2d 1025 (1980).

Next, appellant contends that counsel was ineffective for failing to move for a mistrial as a result of Officer Daniel Corbin's testimony. The record shows that counsel posed an objection to the following response during the prosecution's case:

Q. When you got in touch with Detective Bright, specifically why did you call him?

A. I was in touch with him after contacting the Ambler Police Department. I believe Mr. Mancini had an Ambler address. I was put in touch with Detective Bright, who advised me the defendant, Mr. Mancini, was involved in a burglary.

Notes of Trial Testimony at 177.

Trial counsel objected and the objection was sustained. According to appellant, counsel should have moved for a mistrial because "Officer Corbin's testimony placed before the jury the personal opinion of Detective Bright ... that Mr. Mancini was guilty of the burglary in question." Brief for Appellant at 35.

■■■ The remark would not have provided appellant a basis for a mistrial because it was not the kind of remark which would have had an unavoidable effect on the jury.

Appellant's last contention which was not addressed by the trial court concerns whether the trial court erred in failing to question the appellant and his counsel to determine if irreconcilable differences existed between them. We reject appellant's contention.

After the jury was selected and prior to the swearing of the jury, appellant moved for a continuance and for withdrawal of counsel. The trial court dismissed appellant's petition on the grounds that it was not acknowledged by a notary.

■■■ A request for the dismissal of counsel is addressed to the sound discretion of the trial court. *Commonwealth v. Owens*, 496 Pa. 16, 436 A.2d 129 (1981). Additionally, we recognize that "[a] motion for change of counsel by a defendant to whom counsel has been assigned,

shall not be granted except for substantial reasons." Pa.R. Crim.P. 316(c)(ii).

We conclude that the trial court's decision to dismiss appellant's request on the day the trial was to begin was denied properly. *See Commonwealth v. Jones,* 298 Pa.Super. 199, 444 A.2d 729 (1982).

Because the other issues appellant raises were addressed by the trial court, there is no need to comment further.

Judgment of sentence is affirmed.