614 A.2d 1180

COMMONWEALTH of Pennsylvania

v.

Samuel HARPER, Appellant.

Superior Court of Pennsylvania.

Argued May 12, 1992.

Filed Sept. 22, 1992.

Bernard L. Siegel, Philadelphia, for appellant.

Laurie Magid, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before WIEAND, OLSZEWSKI and KELLY, JJ.

WIEAND, Judge.

Samuel Harper was tried by jury and was found guilty of burglary, rape, corruption of a minor and making terroristic threats. Following the filing of post-trial motions, Harper's trial counsel was replaced by new counsel, who filed supplemental post-trial motions alleging that trial counsel had ren-

dered ineffective assistance. An evidentiary hearing was held, but thereafter the trial court denied post-trial relief and sentenced Harper to serve an aggregate term of imprisonment of not less than ten (10) years nor more than twenty-two (22) years. A direct appeal was dismissed when counsel failed to file an appellate brief. Pursuant to a petition under the Post Conviction Relief Act, however, Harper was later granted the right to file a direct appeal nunc pro tunc. It is this appeal which is now before the Court. Harper argues that the trial court erred by permitting a police officer to give inadmissible hearsay testimony and by instructing the jury that the evidence was "self-explanatory" as to his identity as the rapist. Harper also contends that his trial counsel and/or sentencing counsel were constitutionally ineffective in the following respects: (1) failing to call a witness who would have impeached the victim's testimony on the issue of identification; (2) not calling appellant to testify on his own behalf at trial; and (3) allowing appellant to be denied his right of allocution at sentencing.[1] We will address these claims seriatim.

The evidence established that, on September 26, 1986, at or about 5:30 a.m., appellant entered a house at 5739 West Knox Street in Philadelphia by cutting a window screen. Once inside the house, appellant entered the bedroom of ten year old Sakenna Walker, who was home alone at the time. The child was awakened when she felt someone touching her vagina. When she got out of bed and turned on a light, she recognized appellant, whom she knew from seeing him in the neighborhood. Appellant grabbed the child and pulled her back into bed and shut off the light. He ordered the child to remove her clothing, telling her that he had a knife. When the victim removed her clothing, appellant got on top of her and put his penis into her vagina.

After appellant left, the victim called her mother, and the police were summoned. The victim told police that it had

1. Appellant additionally asserted in his brief the contention that trial counsel had been ineffective for failing to object to the incomplete polling of the jury following announcement of the verdict. This issue, however, was withdrawn as a basis for relief at the time of oral argument before this Court.

been appellant who had raped her. She said that she knew him by the nickname "Ir–Ir" and that she had recognized his voice during the incident. A subsequent medical examination of the victim revealed redness and irritation at the opening of the victim's vagina and cuts, bleeding and other signs of acute trauma in the internal portion thereof. There was also a small amount of discharge found at the opening of the victim's vaginal area.

As a result of information supplied by the victim, it was announced by police radio that appellant was a suspect. When he was spotted by police, appellant fled on foot and ran into the rear entrance of a house located at 224 West Rittenhouse Street, where he was subsequently found hiding in a closet. Appellant was arrested and, after being identified by the victim, was charged with the offenses for which he was subsequently convicted. At trial, he was positively identified by the victim.

On the first day of trial, prior to calling Police Officer Leroy Wilson as a witness, the Commonwealth made the following offer of proof:

MS. BARATZ [Assistant District Attorney]: The Commonwealth's next witness is Officer Leroy Wilson, who will testify that Ruth Holley, the defendant's girlfriend, was on the crime scene that morning and was looking in the windows and in the doors of the crime scene and saw a sock on the bed and said, that's the defendant's sock. He will lay a foundation that she was excited in doing that.

Counsel is objecting that it is not an ex[c]ited utterance, and therefore, not admissable [sic] to one of those two exceptions to the hearsay rule.

One, the Commonwealth insists it was an excited utterance, that she was excited. There had been a rape that occurred there and she saw that and knew it was his sock and was excited about it.

Number two, even if it is not an excited utterance, it's a present sense impression with an exception under Commonwealth versus Coleman. . . .

MR. GROSS [Defense Counsel]: I would object. It was not an excited utterance. It's an identification of an article of clothing.

THE COURT: It is a present sense impression.

MR. GROSS: That is not a [present] sense impression.

The objection was overruled, and the officer testified as follows:

Q. Officer, did you have occasion to go to 5739 Knox Street on the morning of September 26th 1986?

A. Yes, I did.

Q. What time did you arrive there?

A. About eight o'clock, eight something, like that, in the morning.

Q. While you are there, did you have occasion to see somebody named Ruth Holley?

A. Yes, I did.

Q. How do you know her?

A. I know Ruth. I be knowing her for a long time because I work that district.

Q. Now, is this the mother, Ruth Holley, or the daughter?

A. The daughter.

Q. Now, where was it that you saw the daughter, Ruth Holley?

A. I was going to the crime scene at that address when Ruth came up to the crime scene where I was.

Q. What happened when she came up there?

A. She came up to the crime scene and she was talking to me and she asked me what were we doing, and I was telling her we were guarding the scene on account of a rape. She was peeping through the window, trying to look through the door.

Q. What window was it that she was trying to peep into?

A. I believe it was the front window.

Q. What door was she looking into?

A. It was like a hallway with a vestibule and this was to the right as you enter the apartment.

Q. So, was she looking into the room where the crime allegedly occurred?

A. Yes.

Q. What happened as she was looking into the window or the door?

A. She told me that they are her boyfriend's socks, that it was her boyfriend's socks that was on the bed in the room of the window she was looking into.

Q. How did she say that?

A. She said, "I think these are Irving's. Those are my boyfriend's socks laying on that bed."

Q. I am going to show you what was marked Commonwealth Exhibit Six.

Is this one of the socks laying on the bed?

A. That seems to be the sock.

Q. Now, do you know who her boyfriend is?

A. No, I don't recall him.

Q. You don't know?

A. No.

Q. But, she said, she did say, "my boyfriend, Irving"?

A. Yes.

Q. Did she use any other word?

A. Not that I can recall.[2]

■ The present sense impression exception to the hearsay rule permits testimony of "declarations concerning conditions or non-exciting events which the declarant is observing at the time of his declaration." *Commonwealth v. Coleman,* 458 Pa. 112, 117, 326 A.2d 387, 389 (1974) (plurality opinion). The present sense impression exception has been characterized as follows:

This exception requires that the declarant see the event and make an observation about it to another person also present at the scene; the observation must be made at the time of

**2.** Later testimony by Sergeant Robert Feeney related a statement given by appellant in which he referred to Ruth Holley as the girl with whom he lived, thus, making it clear that appellant was the boyfriend to whom Holley was referring.

the event, or so shortly thereafter that it is unlikely that the declarant had the opportunity to form the purpose of misstating his observation. McCormick, *supra* at 860–62. Commentators have generally characterized the occurrence giving rise to the declaration as an unexciting event. *See* Thayer, *supra* at 83; Morgan, Res Gestae, 12 Wash.L.Rev. 91, 98; *but see* Wigmore Evidence § 1747 (Chadbourn rev. 1976). Reliability is considered assured by the contemporaneousness of the statement, and by the fact that the observation is made to another person. McCormick, *supra.* *Commonwealth v. Blackwell*, 343 Pa.Super. 201, 212, 494 A.2d 426, 431 (1985). The Supreme Court has observed further that:

> [u]nder this exception the necessity for the presence of a startling occurrence or accident to serve as a source of reliability is not required. The truthfulness of the utterance is dependent upon its spontaneity. It must be certain from the circumstances that the utterance is a reflex product of immediate sensual impressions, unaided by retrospective mental processes. Restated, the utterance must be "instinctive, rather than deliberate." *Commonwealth v. Coleman*, 458 Pa. 112, 117, 326 A.2d 387, 389 (1974).

*Commonwealth v. Farquharson*, 467 Pa. 50, 68, 354 A.2d 545, 554 (1976).

 Ruth Holley's statement that the sock which she observed on the victim's bed belonged to her boyfriend, as related to the jury by Officer Wilson, was within the present sense impression exception to the hearsay rule. Holley's statement was a contemporaneous verbalization of her having observed the sock on the bed when she looked into the window of the victim's house. The evidence is that there was no opportunity for retrospective thought on Holley's part prior to relating her impression to Officer Wilson. Therefore, the trial court did not err when it allowed Officer Wilson to relate Holley's observation to the jury.

 Immediately after defining the crime of rape in its charge to the jury, the trial court made the following comments:

After considering the evidence in this case, in order to find rape, are you convinced beyond a reasonable doubt, one, that the young lady was raped and, two, that the defendant did the raping—*well that is self-explanatory from the evidence*—that the defendant had sexual intercourse as I have defined it for you with the complainant, you then consider, was he the complainant's spouse, was the intercourse accompanied by force or by threat of force that would prevent a person of reasonable resolution, using the conditions of this young lady, from resisting, and remember, she did not have to test the determination of her assailant to carry it out, if you find those elements that I have described to you and you are convinced that those elements exist beyond a reasonable doubt, then you find that the crime of rape has been committed, and if you find in this particular set of circumstances that the defendant was the assailant and you find it beyond a reasonable doubt, then you convict. (Emphasis added).

Appellant argues that by these comments the trial court, in effect, told the jury that it was "self-explanatory" from the evidence that he had raped the victim. The Commonwealth, on the other hand, suggests that the trial court merely stated that it was the issues involved in the case that were "self-explanatory" from the evidence.

"In reviewing jury instructions to determine whether reversible error has been committed by a trial court, we consider the charge as a whole. Error will not be predicated on isolated excerpts. Rather it is the general effect of the charge that controls." *Commonwealth v. Myers*, 376 Pa.Super. 41, 50, 545 A.2d 309, 314 (1988). "Even if the court erred when it instructed the jury, we will reverse only if the error prejudiced the appellant." *Commonwealth v. Klinger*, 369 Pa.Super. 526, 540, 535 A.2d 1060, 1066 (1987). A jury instruction given by the trial court will be upheld so long as it "sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision." *Commonwealth v. Prosdocimo*, 525 Pa. 147, 154, 578 A.2d 1273, 1276 (1990).

After careful review of the entire charge given by the trial court, we conclude that there was no error. Appellant has attempted to seize upon a very brief, isolated excerpt from the charge and have us construe it in a manner suggesting an imp:oper comment by the court regarding the ultimate issue of guilt or innocence. Review of the entire charge, however, reveals that the trial court gave instructions which accurately and evenhandedly apprised the jurors of the legal principles applicable to the instant case. Indeed, near the end of the charge, the trial court admonished the jury to "always remember, the princip[al] interest in this case is the identity of the perpetrator and you must find that the defendant is the one person who did it beyond a reasonable doubt." When the charge is considered as a whole, it is clear that the trial court did not commit reversible error.

The standard we employ to evaluate claims of ineffective assistance of counsel has been stated by the Pennsylvania Supreme Court in the following manner:

> The threshold inquiry in such claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim. *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985). If this threshold is met, it must next be established that the particular course chosen by counsel had no reasonable basis designed to effectuate his client's interests. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). Finally, we require that the defendant establish how counsel's commission or omission prejudiced him. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

*Commonwealth v. Durst,* 522 Pa. 2, 4–5, 559 A.2d 504, 505 (1989). See also: *Commonwealth v. Rollins,* 525 Pa. 335, 344, 580 A.2d 744, 748 (1990); *Commonwealth v. Davis,* 518 Pa. 77, 83, 541 A.2d 315, 318 (1988). To establish prejudice under this standard "requires [a] showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668,

687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). See also: *Commonwealth v. Pierce*, 515 Pa. 153, 157–158, 527 A.2d 973, 974–975 (1987); *Commonwealth v. Gainer*, 397 Pa.Super. 348, 352, 580 A.2d 333, 335 (1990) (en banc). "Because the law presumes that counsel is effective, the burden of establishing ineffectiveness rests with appellant." *Commonwealth v. House*, 371 Pa.Super. 23, 28, 537 A.2d 361, 363 (1988). See also: *Commonwealth v. Floyd*, 506 Pa. 85, 90, 484 A.2d 365, 367 (1984); *Commonwealth v. McKendrick*, 356 Pa.Super. 64, 71, 514 A.2d 144, 148 (1986). Moreover,

> "[b]efore a claim of ineffectiveness can be sustained, it must be determined that, in light of all the alternatives available to counsel, the strategy actually employed was so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981). We inquire whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect defendant's interests. See *Commonwealth v. Hill*, 450 Pa. 477, 301 A.2d 587 (1973). Thus, counsel's assistance is deemed constitutionally effective once we are able to conclude the particular course chosen by counsel had some reasonable basis designated to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604, 235 A.2d 349 (1967).

*Commonwealth v. Dunbar*, 503 Pa. 590, 596, 470 A.2d 74, 77 (1983). See also: *Commonwealth v. Gainer, supra; Commonwealth v. Akers*, 392 Pa.Super. 170, 190, 572 A.2d 746, 756 (1990).

█ Appellant asserts that trial counsel was ineffective because he failed to call as a witness at trial one Mary Freeman, who would have offered testimony impeaching the victim's identification of appellant as her assailant. Freeman testified at the hearing on appellant's post-trial motions that three days after the rape the victim had told her that she

didn't know what had happened because she didn't see who did it.

The failure of counsel to present possible witnesses is not per se ineffective assistance of counsel. See: *Commonwealth v. Smallwood*, 497 Pa. 476, 486–487, 442 A.2d 222, 227 (1982); *Commonwealth v. Flanagan*, 375 Pa.Super. 497, 500, 544 A.2d 1030, 1031 (1988). "It is well-settled that the failure of trial counsel to call a particular witness does not constitute ineffective assistance unless there is some showing that the testimony of the absent witness would have been beneficial or helpful in establishing the asserted defense." *Commonwealth v. Durst, supra*, 522 Pa. at 6, 559 A.2d at 506. Moreover, [t]he decision whether to call a witness is a matter of trial strategy. *Id.*, 497 Pa. at 487, 442 A.2d at 227. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–691, 104 S.Ct. at 2068, 80 L.Ed.2d at 695.

*Commonwealth v. Lee*, 401 Pa.Super. 591, 600–601, 585 A.2d 1084, 1089 (1991). To prevail on his claim that trial counsel was ineffective for failing to call Mary Freeman as a witness at trial, appellant was required to establish that:

'1) the witness existed; 2) the witness was available; 3) counsel was informed of the existence of the witness or counsel should otherwise have known of [her]; 4) the witness was prepared to cooperate and testify for appellant at trial; and 5) the absence of the testimony prejudiced appellant so as to deny him a fair trial.'

*Commonwealth v. Nock*, 414 Pa.Super. 326, 328, 606 A.2d 1380, 1381 (1992), quoting *Commonwealth v. Petras*, 368 Pa.Super. 372, 377, 534 A.2d 483, 485 (1987).

Appellant has established that the witness, Mary Freeman, existed and was available to testify and also that trial counsel was aware of the witness's existence. If, in fact, Freeman would have testified that the victim had told her that she

didn't see who had raped her, such testimony would obviously have been helpful to the defense. Nevertheless, it remains to be determined whether counsel acted reasonably in determining not to call Mary Freeman as a witness at appellant's trial.

When called as a witness at the hearing on appellant's post-trial motions, trial counsel admitted that he was aware of Mary Freeman and had in fact anticipated calling her as a witness at appellant's trial. However, counsel specifically denied that Freeman had ever told him that the victim had said to her that she had not seen her attacker. Counsel testified that had Freeman ever related such information he would have called her as a witness. Based upon the information which Freeman had actually provided, however, counsel determined that the witness's testimony would not have been helpful, and may have been detrimental to the defense. He explained his reasons for not calling Freeman to testify at trial in the following manner:

A. One, because everything she would have been called to testify to that was admissible that did not relate to statements made by the mother who did not testify, was already brought out and admitted to by the complaining witness and it seemed from a statement that she gave our detectives, that the—

Q. Do you have that statement here?

A. Excuse me?

THE COURT: Well, wait a minute. Let's not cross-examine before he gives you a full statement.

THE WITNESS: She describes the Erving, the boyfriend, as being a white man. It was not clear from the testimony of this complaining witness that he was a white man. It was—all that was asked for, wasn't he lighter skinned than the defendant. And if I wanted to try to convince the jury that there was a misidentification and it was really the other guy, I thought I was better letting the jury think that he was also a black man, not a white man.

After careful review, we conclude that counsel's decision not to call Mary Freeman as a witness was not so unreasonable as

to warrant a finding that he was constitutionally ineffective. First, the record discloses that counsel did investigate the possibility of calling Freeman as a witness, but that Freeman did not relate to counsel or his investigators the information which appellant now argues would have been important to his defense. Secondly, based upon the information actually supplied by Freeman to counsel, it appears that her testimony may actually have hurt the defense. At trial, counsel attempted to establish that the victim had confused a former boyfriend of her mother, whose name was Irving, with appellant, who's nickname was "Ir–Ir." In this manner counsel attempted to offer an alternative to appellant as the suspect. When Freeman told counsel that the mother's former boyfriend was a white man, however, it was not unreasonable for counsel to conclude that such information, if made known to the jury, would have been detrimental to the defense theory of misidentification. Under all of these circumstances, we conclude that counsel's strategic decision not to call Mary Freeman as a witness was not so unreasonable as to constitute ineffective assistance of counsel.

■ Appellant next argues that trial counsel was ineffective by failing to call him as a witness in his own defense despite his communication to counsel of a desire to testify. The Superior Court has observed that:

The decision whether to testify in one's own behalf is ultimately to be made by the accused after full consultation with counsel. *Commonwealth v. Rawles,* 501 Pa. 514, 523 n. 3, 462 A.2d 619, 624 n. 3 (1983); *Commonwealth v. Wallace,* 347 Pa.Super. 248, 254, 500 A.2d 816, 819 (1985); *Commonwealth v. Mancini,* 340 Pa.Super. 592, 607, 490 A.2d 1377, 1385 (1985). In order to support a claim that counsel was ineffective for not "putting" the appellant on the witness stand, the appellant must demonstrate either that (1) counsel interfered with his client's freedom to testify, or (2) he gave specific advice so unreasonable as to vitiate a knowing and intelligent decision by the client not to testify in his own behalf. Cf. *Commonwealth v. Martin,* 346 Pa.Super. 129, 142, 499 A.2d 344, 351 (1985) (decision to testify was ultimately and solely the defendant's, and strategic errors,

without specific incidents of counsel impropriety, were insufficient to find trial counsel ineffective).

*Commonwealth v. Fowler*, 362 Pa.Super. 81, 87, 523 A.2d 784, 787 (1987). See also: *Commonwealth v. Bazabe*, 404 Pa.Super. 408, 414, 590 A.2d 1298, 1301 (1991).

Appellant testified at the post-trial hearing that he had informed counsel that he desired to testify at trial and that counsel had told him that he would get his chance to testify, but that counsel never did call him to testify. Appellant's testimony was sharply contradicted, however, by the testimony of trial counsel, who explained the manner in which the decision not to call appellant as a witness was made. Counsel testified as follows:

BY MR. CHAPPELLE [Post–Trial Motions Counsel]:

Q. Now, did you and my client ever discuss his testifying, if you recall?

A. I know I talked over the case with him. I know I talked over to him what he knew about it and various things like that. I know I never—well, I shouldn't say I know—I don't have a recollection of ever having prepping him to testify: I'm going to ask you these questions, et cetera, et cetera; this is what the D.A. may ask you.

I do have a recollection—I think—pshew! I think it was—with respect to his testimony where what I said to him was, "I know it's tough to sit here and listen to what they're saying" and I don't remember if I said "and not present witnesses" or "not present your side" or "not testify"—"but I really think in this case it's better for you not to."

And I explained to him why. And my recollection is that he somehow indicated agreement. I can't say he said, "okay". I may have said to him, "okay? Is that all right? I'm just going to close without your testifying." And he either nodded or did something to that effect.

I would never—there are two decisions that I consider not to be my decision. All other decisions at trial I consider to be my decisions, whether I call alibi witnesses or don't call them. The two decisions I do consider

always to be the defendant's decision: whether or not he testifies, though I could strongly advise him not to; or whether or not he takes a jury. But I may strongly advise him one way or the other.

And whether I specifically recall the incident—I mean, that's the best of my recollection, that somehow he indicated to me. He may have indicated that he wanted to testify. There was a point—as a matter of fact, there was a point where we discussed, when we discussed his not testifying, but getting on the stand solely for the purpose—it was up in the cell room. I talked to him about it, "I may put you on just to try on the sock."

And it was not in the courtroom that I decided not to do it. It was after—oh, well, first of all, I looked at it in the courtroom. I said, it looks to me like it's one of those one-size-fits-all socks, so it's not going to be anything that we're going to be able to demonstrate by your trying it on.

What convinced me not to have him do that was, I asked him to roll up to show me what he was wearing and he was wearing a pair of socks that were exactly the same kind of sock. Now, true, it was a white sock but there are lots of kinds of white socks. This was a particular kind of white socks. The ones he was wearing were exactly the same.

Q. You're talking about tube socks?

A. Tube socks of a particular length, where the band is in a particular place and it's not knit all the way up, versus knit.

And I said, there's no way I'm going to—I said, you know, if there were a way I could get you to change your socks—do you have a change of socks somewhere? Might have been the day or night before. So you change your socks at the prisons. Do you have other socks at the prison? He said, no. I said, if those are the only socks you have, I'm not going to put you on the stand to put on the sock.

Q. Well, do you remember—you remember having that conversation with him?

A. Yes, I do.

. . . .

BY MR. CHAPPELLE:

Q. You don't recall specifically discussing with my client as to whether he should testify about where he was at the time of this incident?

A. Everything that he would have said about where he was at the time of the incident came out through the Commonwealth's case when I introduced his statement. I didn't see any other reason to put him on the stand and subject him to cross-examination where lots of other things might come out that are harmful, when his version came out through the Commonwealth's statement.

Q. So, more or less you had decided when you read the statement and had some contact with my client, that it wouldn't be wise for him to testify, right?

A. That it wouldn't be wise?

Q. Yes.

A. I don't know when I formed a conclusion. I know that he has trouble expressing himself. I didn't think he would be a great witness. I didn't know if the Commonwealth was going to use the statement or not in their case in chief. Once they used it in, which they offered his explanation, because he gave the police in that an explanation as to where he was. . . .

■ We are satisfied that the trial court did not err when it denied post-trial relief on grounds that trial counsel had been ineffective for failing to allow appellant to testify. It is readily apparent from trial counsel's testimony at the post-trial hearing that counsel did not interfere with appellant's right to testify on his own behalf and that counsel's advice to appellant not to testify was not so unreasonable as to constitute ineffective assistance. Rather, it is clear that it was appellant who decided not to testify after receiving counsel's advice. As such, "appellant 'must bear the burden of his decision not to testify and [he] cannot shift the blame to his attorney.'" *Commonwealth v. Fowler, supra,* 362 Pa.Super. at 87, 523

A.2d at 788, quoting *Commonwealth v. Mancini*, 340 Pa.Super. 592, 610, 490 A.2d 1377, 1385 (1985).

■ Finally, appellant argues that his counsel at sentencing was ineffective for failing to object when the trial court failed to permit him to make a statement prior to the imposition of sentence. Review of the record discloses that at the sentencing hearing a dispute arose as to the nature of appellant's employment history as reflected in the pre-sentence report. Therefore, the court questioned appellant about the history of his employment. Prior to imposing sentence, however, the court did not inform appellant that he had a right to make a statement. The court merely asked defense counsel if he had anything else, to which counsel replied: "Not at this time." Thereafter, sentence was imposed.

Pa.R.Crim.P. 1405(a) provides:

At the time of sentencing, the judge shall:

(a) afford the defendant the opportunity to make a statement in his own behalf and afford counsel for both parties an opportunity to present argument and information relative to sentencing;

This rule has been interpreted by the Pennsylvania Supreme Court as guaranteeing a defendant the right of allocution. Thus, in *Commonwealth v. Thomas*, 520 Pa. 206, 553 A.2d 918 (1989), the Court said:

The right to personally address the court prior to sentencing is of ancient origin. Often referred to as the "ancient inquiry," the practice originated in the English common law where, as early as 1689, any failure to permit a defendant to plead for mercy required reversal. Although at some points in our history the right has been limited, see, e.g. *Commonwealth v. Gates*, 429 Pa. 453, 240 A.2d 815 (1968), *Commonwealth v. Senauskas*, 327 Pa. 541, 194 A. 646 (1937), our modern cases have expressly rejected the notion that allocution is an anachronism in modern criminal practice. In *Commonwealth v. Knighton*, 490 Pa. 16, 19, 415 A.2d 9, 11 (1980), we recently stated:

Notwithstanding the modern innovations in our law, nothing has "lessen[ed] ... the need for the defendant, per-

sonally, to have the opportunity to present to the court his plea in mitigation. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 658, 5 L.Ed.2d 670, 673 (1961) reh'g. denied 365 U.S. 890, 81 S.Ct. 1024, 6 L.Ed.2d 201.

Moreover, our rules of criminal procedure guarantee the right to all who stand convicted of crimes.

Pa.R.Crim.P. 1405, which was promulgated in 1973, provides in pertinent part as follows:

Rule 1405. Sentencing Proceeding

At the time of sentencing, the judge shall:

(a) afford the defendant the opportunity to make a statement in his own behalf and afford counsel for both parties an opportunity to present argument and information relative to sentencing[.]

(Emphasis supplied.) Since a trial judge will not know in most cases whether a defendant is aware of his right to address the court prior to sentencing, but Rule 1405 requires the court to afford the defendant an opportunity to speak, we understand Rule 1405 to require the trial court to inform the defendant of his right to speak prior to sentencing.

*Id.* 520 Pa. at 208–209, 553 A.2d at 919.

The decision in *Thomas,* the Supreme Court has said, is not to be applied retroactively. *Id.,* 520 Pa. at 210, 553 A.2d at 919. Appellant was sentenced on February 23, 1988, almost a year before the decision in *Thomas.* Counsel, therefore, will not be deemed ineffective for failing to object when the trial court, at the time of sentencing, failed to specifically inform appellant of his right of allocution.

The judgment of sentence is affirmed.