J-S47033-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| SAMIR BENTLEY | : | |
| | : | |
| Appellant | : | No. 3103 EDA 2022 |

Appeal from the Judgment of Sentence Entered October 12, 2022
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0002293-2022

BEFORE: STABILE, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED MARCH 4, 2024**

Appellant, Samir Bentley, appeals from the judgment of sentence entered on October 12, 2022, in the Montgomery County Court of Common Pleas. We affirm.

The relevant facts and procedural history, thoroughly laid out by the trial court, are as follows:

> The four-day jury trial commenced on October 7, 2022 and established the following facts. On October 23, 2021, at approximately 8:26 p.m., Officer Eric Weber, of the Pottstown Police Department was on patrol and was dispatched to the 400 block of East High Street, Pottstown for a call of shots fired. (N.T., Trial by Jury, 10/7/22, p. 39, 40). He arrived on the scene and found Robert Stiles with two gunshot wounds to his abdomen. ***Id.*** at 43. While rendering aid to the victim, the officer testified that he did not find any weapon on or in the vicinity of the victim. ***Id.*** at 43 - 44. Officer Weber secured the crime scene, and canvassed the area for evidence. ***Id.*** at 43, 47. He observed a significant

---

Former Justice specially assigned to the Superior Court.

amount of shell casings, a 22 caliber, a .9 caliber, and .45 caliber. *Id.* at 48. The paramedic also provided the officer with a bullet fragment that fell from the victim's clothing. *Id.* at 44 - 45.

Detective Brooke Hatfield of the Pottstown Police Department responded to the initial crime scene. *Id.* at 53. She located video surveillance from the area and from a Wawa in Royersford. *Id.* at 58 - 59. The surveillance video audio from the Blue Moon Deli, right where the murder occurred, at 8:24 p.m., recorded Quadir Nixon saying, "Jig, Mir, and (unintelligible) are robbing County right now, have him gunned down in the corner now. They have a gat to him right now." *Id.* at 66. The video depicted Mohammed, the individual in a black and white sweatshirt pull the victim into the cut. *Id.* at 67, 69. It also showed Harrison, who was wearing a pink hat hand the gun to Appellant. *Id*. Appellant, who was wearing a teddy bear sweatshirt, fired three shots at the victim. *Id.* at 67, 69 - 70. Another video depicted much of the same, in addition the video depicted a single shot being fired, followed by three more shots. *Id.* at 71 - 73. The significance of this video was that law enforcement found one 9mm shell casing inside the cut and three .45 caliber shell casings on the sidewalk where Appellant fired the three shots. *Id.* at 73. The video also showed that in response to the shooting, Eric Baker fired off seven or eight .22 caliber shell casings. *Id*. No firearms were found at the crime scene, and no weapon was recovered from the victim's belongings. *Id.* at 78. In addition to this video evidence, detective Hatfield testified that a grey minivan was associated with the murder, and that a license plate reader determined it was a stolen vehicle. *Id.* at 92, 94.

Detective Heather Long with the Montgomery County Detective Bureau testified that surveillance footage showed that after the murder, Appellant and Mohammed got into the minivan and drove off, while Harrison fled the scene on foot. *Id.* at 228. Additional surveillance footage recorded the minivan traveling towards a Wawa in Royersford. *Id.* at 128 - 129. Mohammed made a purchase in Wawa, and he had a handful of cash. *Id.* at 129. Appellant and Mohammed exited the Wawa and got into a different vehicle. *Id.* at 130.

Dr. Supriya Kuruvilla performed the autopsy on the victim on October 24, 2021. (N.T., Trial by Jury, 10/10/22, p. at 23). The doctor noted two gunshot wounds, one on the right lower back, and the other was to the right lower abdomen. *Id.* at 25. Both of these wounds involved extensive damage to the victim's internal organs and either could have been fatal. *Id.* at 25 - 26, 30, 39.

On October 25, 2021, Officer Eric Pistilli of the Royersford Borough Police Department received a call for an abandoned minivan in a residential driveway at 962 Walnut Street. *Id.* at 52 - 54. The Wawa where Appellant and Mohammed were caught on surveillance was just north of this location. *Id.* at 57. The right passenger tire was completely flat and there were bullet holes in the driver's side. *Id.* at 54. The officer determined that it was a stolen vehicle. Id. at 55. The minivan was taken to a secure facility. *Id.* at 56. Detective Terrance Lewis from the Montgomery County Detective Bureau processed the minivan on October 26, 2021. *Id.* at 68. In part, the detective recovered ballistic evidence from the minivan and he turned over this evidence and additional ballistic evidence to Detective Nelson, a firearms examiner. *Id.* at 77, 78.

Firearm expert, Detective Eric Nelson, conducted several examinations on the ballistic evidence. *Id.* at 86, 92, 96. He examined seven 22 caliber fired shell casings ("FCC"), three 45 caliber shell casings, and one .9mm shell casing, which were all found at the murder scene. *Id.* at 98. From a microscopic analysis he determined, that all of the 22 caliber FCCs were fired from the same firearm. *Id*. The three .45 caliber FCCs were fired from the same firearm. *Id.* at 100. Detective Nelson could not compare any of these FCCs to a specific firearm since none were recovered. *Id.* at 98, 100. He further explained that the bullet recovered during the autopsy and the bullet fragment recovered from the surgery on the victim were both 45 caliber and from the same firearm[.] *Id.* at 103.

Co-conspirator Harrison was called to testify. On October of 2022, he was living in Philadelphia. *Id.* at 142. He was good friends with Appellant and had known him for over ten years. *Id.* at 142, 144. Harrison had been in a relationship with Appellant's sister for years, and Appellant is his daughter's uncle. *Id.* at 143 - 144. Harrison knew Appellant's nickname to be Miro and Mir. *Id.* at 147. Harrison also knew the victim, and knew him as County. He had bought marijuana from County many times over the years. *Id.* at 154 - 155. However, Harrison only met Mohammed on the day of the murder. *Id.* at 147.

During the afternoon of October 23, 2021, Harrison went from his home in Philadelphia to Pottstown. *Id.* at 156. The plan was to hang out with his brother and work on rap videos together. *Id*. Appellant picked Harrison up from his home around 3 or 4 p.m., in a dark minivan. *Id.* at 158, 159. Mohammed was also present when Harrison was picked up. *Id.* at 160. Harrison admitted to having a 45 caliber firearm with him. *Id.* at 161. When

they got to Pottstown, they pulled into the Gulf gas station, and he saw Quadir Nixon ("Nixon") and the victim there. *Id.* at 162 - 163. Nixon was pumping gas, and he saw the victim in the back seat of the white car counting cash, about $300 or $400. *Id.* at 164, 166. Harrison joked with the victim about having all that money, and he laughed and pulled out more money. *Id.* at 167. He estimated it was a total of $5000. *Id.* at 168. When Harrison, Appellant, and Mohammed were all back in the vehicle, Mohammed was on his phone on FaceTime. *Id.* at 170. The person on the phone was asking whether they knew of someone to rob. *Id.* at 170 - 171. After the call ended, Harrison mentioned that the victim and Nixon were just flashing money, so they could rob one of them. *Id.* at 172. Harrison told Mohammed that the plan would be that Mohammed would ask the victim if he had marijuana, get him away from everyone, and Mohammed would rob him, using a gun. *Id.* at 172, 174. Harrison offered Mohammed his gun, but he did not take it. *Id.* at 175. Appellant wasn't really a part of the conversation because he had his earphones in, but it was possible he heard it. *Id.* at 175. Harrison said that Appellant would be the lookout. *Id.* at 176.

Harrison knew that the victim and Nixon would be in front of the Blue Moon Deli, and Appellant drove there. *Id.* at 177, 232. The three of them get there around 6 p.m, and parked the minivan across the street. *Id.* at 177, 178. While they were hanging out there, the topic of the robbery came back up. *Id.* at 178. They were talking about what was going to happen. *Id.* at 233. Harrison told police in his statement that Appellant and Mohammed were both involved in the conversation about the robbery with him. *Id.* at 234 - 235, 236. Harrison said he would go into the Blue Moon Deli and ask the victim if he had any marijuana, which he did. *Id.* at 178. The victim told him he did not have any marijuana. *Id.* at 179. He communicated this back to Mohammed and to Appellant. *Id.* at 179, 180. This did not change the plan, because Harrison knew the victim had money. Id. at 180. The opportune moment presented itself when the three of them were three stores down from the Blue Moon Deli, right near the cut. *Id.* at 181. Harrison turned around and looked at Appellant. *Id.* at 182. He gave Appellant a head nod as a signal to put the plan in motion. *Id.* Harrison turned away. *Id.* at 183, He heard Nixon say, "Y'all weird. What y'all doing?" *Id.* Appellant told him to "Chill." *Id*. Appellant was positioned between the cut and Nixon. *Id.* at 183 - 184. Nixon walked away. *Id.* at 183. Once Harrison walked past the cut, he realized that the robbery was happening. *Id*. He saw the back of the victim, and it looked like the victim was going into

his jacket pocket. *Id.* at 184 - 185. Although Harrison could not see what was coming out of his pocket, he never saw the victim with a gun. *Id.* at 185. He assumed that the victim was giving things up as part of the robbery. *Id.* at 186. Mohammed was behind the victim in the cut. *Id.* at 185. Harrison also heard Appellant say, "He got a jawn, he got a jawn." *Id.* at 186 - 187. Harrison believed Appellant was referring to Nixon, that Nixon had a gun. *Id.* at 187, 238 - 239. Harrison turned around, walked towards Appellant, and handed him his 45 caliber gun. *Id.* at 187, 188. Harrison walked to the street, and heard grabbing and wrestling in the cut. *Id.* at 189. Harrison heard a single gunshot from inside the cut, ran away, and heard three more shots from around the cut. *Id.* at 190. The three of them ran back to the minivan. *Id.* at 191. Harrison took an Uber back to Philadelphia. *Id.* at 194. Five days later he heard that there was a warrant for his arrest, and he turned himself in on November 1, 2021. *Id.* at 196.

William Bentley, Appellant's older brother, spoke to detectives in December 30, 2021 about conversations he had with Appellant after the murder. *Id.* at 248, 249, 251. Mr. Bentley told detectives that at the time of the interview Appellant was in North Carolina and gave them his address. *Id.* at 251. He also told detectives that Appellant had changed his appearance by cutting off his hair. *Id*. Mr. Bentley spoke to Appellant, with Mohammed present, after the murder, and Appellant told him he did something stupid. *Id.* at 253. Mr. Bentley told detectives that Appellant told him the plan was to rob the victim and Mohammed would do the robbery. When Mohammed pulled out his gun, the victim hit him. *Id.* at 255, 257. Mr. Bentley also relayed that Appellant told him that Mohammed and the victim were fighting, and Mohammed shot him. *Id.* at 257. Because the victim was still moving, Appellant took the gun from Mohammed and shot the victim. *Id*. Mr. Bentley knew from Appellant that they set the robbery up as a drug deal, but there was never any intent to do a drug deal. *Id*. It was strictly a robbery. *Id.* at 258. Mr. Bentley also knew that after the robbery they went to Wawa. Mr. Bentley encouraged Appellant to go to North Carolina. *Id.* at 260.

On cross-examination, in part, defense counsel tried to undercut Mr. Bentley['s] testimony. He noted inconsistencies in Mr. Bentley's statement to police, namely that Mohammed was the one who was going to buy the marijuana, but that he also told police that it was Appellant who set up the drug deal. *Id.* at 272 - 277. Defense counsel also highlighted that Mr. Bentley's trial testimony that was erroneous in that he told detectives that

Appellant told him that the gun he used was from Mohammed and that the minivan broke down when they were driving. *Id.* at 277 - 278.

On re-direct, Mr. Bentley was able to clarify that Appellant and Harrison were going to set up the drug deal because they knew him, but that it was Mohammed who was going to actually rob him, since the victim did not know him. *Id.* at 278 - 279.

Appellant testified in his own defense. He admitted to having killed the victim, but stated that he did not intend to. (N.T., Trial by Jury, 10/11/22, p. 8). Appellant denied knowledge of the robbery plot or of any intention to be part of the robbery plan. *Id*. Appellant claimed that he never heard the conversation between Harrison and Mohammed in the minivan about the robbery because he had his earbuds in on a loud volume. *Id.* at 20 - 22. He also denied that [he] was part of the conversation outside the Blue Moon Deli about the robbery, the fake drug deal, or that he would be the lookout. *Id.* at 26 - 27. Appellant told the jury that right before the murder he was near the cut trying to sell Xanax. *Id.* at 29. He heard feet shuffling against cement, and he look[ed] over to the cut and saw the victim there. *Id.* at 30. He denied seeing a struggle between the victim and Mohammed. *Id*. He thought it was just a drug deal. *Id.* at 31. He recalled Nixon walked over and said, [”]What you got going on?[”] *Id.* at 32. Appellant responded, "He handling his business. He getting money. The same thing you got going on." *Id*. Nixon replied and said, "You all weird." *Id*. At one point Appellant looked over at Mohammed and he saw what looked like the victim reaching toward his waistband. *Id.* at 33. Appellant testified that the victim lifted up his shirt or jacket, and he saw a gun handle. *Id*. He was scared and getting ready to run away. He told Harrison that the victim had a gun, and Harrison handed him his gun and told him to protect Mohammed. *Id.* at 34. According to Appellant, he turned back to the cut, and got the gun in position, and a shot went off. *Id.* at 34 - 35. Appellant then fired three shots. *Id.* at 35. Appellant believed the victim had fired the first shot, and he was afraid for his life. *Id.* at 36, 37. He was also afraid that if he tried to leave he would be shot and he was afraid that Ahmed would be shot. *Id.* at 38. After shooting the victim, Appellant ran to the minivan, and when Harrison was there he got his gun back from the backseat. *Id.* at 39. Appellant denied ever having a conversation with his brother. *Id.* at 44.

At the conclusion of the trial, the jury returned a verdict of guilty of the aforementioned charges. [Appellant] was sentenced to a life term of imprisonment for his second-degree murder

conviction, and a concurrent aggregate sentence of 11 to 22 years' imprisonment on his remaining convictions. A post-sentence motion was timely filed on October 24, 20223, which was denied on November 14, 2022. A timely appeal followed.

Tr. Ct. Op. at 3-11.

On appeal, Appellant raises these six issues verbatim:

I. DID THE TRIAL COURT ERR IN FINDING THAT SUFFICIENT EVIDENCE TO CONVICT APPELLANT OF SECOND-DEGREE MURDER, ROBBERY, AND CRIMINAL CONSPIRACY TO COMMIT ROBBERY EVIDENCE AT TRIAL SHOWED APPELLANT DID NOT PLAN A ROBBERY, KNOW OF THE PLOT TO COMMIT ROBBERY AMONG HIS CO-DEFENDANTS, OR KNOWINGLY PARTICIPATE IN THE ROBBERY OF THE DECEDENT?

II. DID THE TRIAL COURT ERR IN FINDING THAT THE COMMONWEALTH DISPROVED SELF-DEFENSE BEYOND A REASONABLE DOUBT WHERE APPELLANT TESTIFIED AS TO HIS FEAR FOR HIS LIFE UPON SEEING THE DECEDENT WITH A FIREARM?

III. DID THE TRIAL COURT ERR IN FAILING TO GRANT A NEW TRIAL WHERE THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE, AS IT RELIED ON THE TESTIMONY OF APPELLANT'S BROTHER, WHOSE TESTIMONY WAS SO RIDDLED WITH INCONSISTENCIES AS TO MAKE IT IMPOSSIBLE TO BELIEVE?

IV. DID THE TRIAL COURT ERR IN ADMITTING OTHER BAD ACTS THAT THE ALLEGED GETAWAY VAN HAD BEEN REPORTED STOLEN TEN DAYS PRIOR TO THE ALLEGED HOMICIDE AND THE COMMONWEALTH FAILED TO SHOW KNOWLEDGE ON PART OF APPELLANT OF THE VAN'S STOLEN STATUS?

V. DID THE TRIAL COURT ERR IN ADMITTING OTHER BAD ACTS OF APPELLANT IN POSSESSION OF FIREARMS NOT ALLEGED TO HAVE BEEN USED IN THE COMMISSION OF THE CRIMES HE WAS CONVICTED OF AND ALLEGEDLY IN HIS POSSESSION SEVERAL DAYS AFTER THE HOMICIDE?

VI. DID THE TRIAL COURT ERR IN ADMITTING THE AUDIO PORTION OF SURVEILLANCE FOOTAGE WHEREIN A DECLARANT IDENTIFIES APPELLANT WHERE THE COMMONWEALTH FAILED TO CALL THE DECLARANT AS A WITNESS AT TRIAL?

Appellant's Br. at 6-7.[1]

Appellant's first issue is that the evidence was insufficient to convict him of second-degree murder, robbery, and criminal conspiracy to commit robbery. Appellant's Br. at 6. We are constrained to conclude that Appellant's sufficiency claim is waived, as Appellant's Rule 1925(b) statement did not sufficiently identify the error that Appellant intended to challenge on appeal.

As this Court has consistently held:

> If Appellant wants to preserve a claim that the evidence was insufficient, then the 1925(b) statement needs to specify the element or elements upon which the evidence was insufficient. This Court can then analyze the element or elements on appeal. [Where a] 1925(b) statement [] does not specify the allegedly unproven elements[,] . . . the sufficiency issue is waived [on appeal].

**Commonwealth v. Williams**, 959 A.2d 1252, 1257 (Pa. Super. 2008), quoting **Commonwealth v. Flores**, 921 A.2d 517, 522-523 (Pa. Super. 2007).

In this case, Appellant's Rule 1925(b) statement simply declared, in boilerplate fashion, that the evidence was insufficient to support his convictions. **See** Appellant's 1925(b) Statement, 12/28/22, at 1. The statement thus failed to "specify the element or elements upon which the evidence was insufficient" to support Appellant's conviction, and we must

---

[1] Appellant has waived his fifth issue on appeal and declined to set forth an argument; thus we will address issues one, two, three, four, and six. **See** Appellant's Br. at 28 (withdrawing issue as moot).

conclude that Appellant's sufficiency of the evidence claim is waived on appeal. ***Williams***, 959 A.2d at 1257.

Appellant's second issue is that the Commonwealth failed to meet its burden of disproving beyond a reasonable doubt that Appellant acted in self-defense. Appellant's Br. at 6. Specifically, Appellant claims that his testimony that the victim had a firearm and Appellant was scared for his life upon seeing it was uncontradicted by the Commonwealth. ***Id.*** at 19. We view Appellant's second issue as a challenge to the sufficiency of the Commonwealth's evidence disproving the element of Appellant's self-defense claim that he reasonably believed himself to be in danger.

Our review of a claim challenging the sufficiency of the evidence is well settled:

> In evaluating a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt. We may not weigh the evidence and substitute our judgment for the fact-finder. To sustain a conviction, however, the facts and circumstances which the Commonwealth must prove must be such that every essential element of the crime is established beyond a reasonable doubt.

***Commonwealth v. Cain***, 906 A.2d 1242, 1244 (Pa. Super. 2006), appeal denied, 916 A.2d 1101 (Pa. 2007) (citations omitted). Lastly, the finder of fact may believe all, some or none of a witness's testimony. ***Id***.

In order to legally establish one's right to self-defense and to use deadly force, three factors must be shown to have existed at the time of the incident:

> First, the actor must have reasonably believed himself to be in imminent danger of death or serious bodily harm, and that it was necessary to use deadly force against the victim to prevent such harm. Second, the actor must have been free from fault in provoking or continuing the difficulty which resulted in the slaying. Third, the actor must have violated no duty to retreat. 18 Pa.C.S.A. § 505; *Commonwealth v. McGuire*, 487 Pa. 208, 409 A.2d 313 (1979); *Commonwealth v. Black*, [474 Pa. 47, 376 A.2d 627 (1977)]; *Commonwealth v. McComb*, 462 Pa 504, 341 A.2d 496 (1975).

*Commonwealth v. Brown*, 421 A.2d 660, 662 (Pa. 1980). *See also Commonwealth v. Molina*, 516 A.2d 752 (Pa. 1986).

When a defendant presents evidence of self-defense, "the Commonwealth bears the burden of disproving the self-defense claim beyond a reasonable doubt. Although the Commonwealth is required to disprove a claim of self-defense . . . a jury is not required to believe the testimony of the defendant who raises the claim." *Commonwealth v. Chine*, 40 A.3d 1239, 1243 (Pa. Super. 2012) (quoting *Commonwealth v. Houser*, 18 A.3d 1128, 1135 (Pa. 2011)). However, "[t]he Commonwealth cannot sustain its burden of proof solely on the fact[-]finder's disbelief of the defendant's testimony." *Commonwealth v. Rivera*, 983 A.2d 1211, 1221 (Pa. 2009) (citations, internal quotation marks, and modifications omitted).

> The Commonwealth sustains that burden of negation "if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that [he] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him]self therefrom; or that the slayer violated a duty to retreat or avoid the danger."

*Commonwealth v. Mouzon*, 53 A.3d 738, 740-41 (Pa. 2012).

- 10 -

As the trial court notes in its opinion, the Commonwealth sufficiently established that the Appellant and his co-conspirators provoked the use of force by robbing the victim at gunpoint, negating the provocation element. Tr. Ct. Op. at 17. Moreover, the record reflects that Appellant's allegations that he acted in self-defense were called into question during the trial. Only the Appellant stated the victim had a firearm and no firearm was recovered from the body of the victim. N.T., 10/7/22, at 78. Appellant admitted that the victim did not lunge at him, threaten him, or point a gun at him. N.T., 10/11/22, at 78, 76. These findings, and the rational inferences to be drawn from them, are not based on a mere disbelief of Appellant's testimony. *See Commonwealth v. Jones*, 271 A.3d 452 (Pa. Super. 2021) (concluding that the Commonwealth disproved self-defense where the appellant shot victim after a bar fight; noting that no weapon was found on the victim, none of the witnesses saw the victim with a weapon, and threats made by the victim did not involve use of a firearm or a weapon). The Commonwealth met its burden by cross-examining Appellant which resulted in these findings. *See Commonwealth v. Bullock*, 948 A.2d 818, 825 (Pa. Super. 2008) (finding the Commonwealth met its burden in disproving a self-defense claim when defendant's allegation that he acted in self-defense was challenged during the trial). As such, Appellant's assertion that the evidence was insufficient to disprove his self-defense claim is without merit.

Appellant's third claim is that the trial court erred in denying Appellant's request for a new trial when the verdict was against the weight of the

evidence. Appellant's Br. at 22. Specifically, Appellant submits that the testimony of Appellant's brother, William Bentley, was so riddled with inconsistencies and contradicted independent evidence that it cannot be believed. *Id*.

Initially, the following legal principles apply when a challenge to the weight of the evidence supporting a conviction is presented to the trial court:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

*Commonwealth v. Widmer*, 744 A.2d 745, 751-52 (Pa. 2000) (citations, footnotes and quotation marks omitted). Thus, to allow an appellant "to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the [trial] court." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2016) (internal citation omitted).

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

**Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis in original).

A challenge to the weight of the evidence must be preserved by a motion for a new trial or else it is waived. Pa.R.Crim.P. 607(A). Additionally, in order to preserve a challenge to either the sufficiency or weight of the evidence on appeal, an appellant's Rule 1925(b) concise statement must state with specificity the elements or verdicts for which the appellant alleges that the evidence was insufficient or against the weight of the evidence. **See Commonwealth v. Freeman**, 128 A.3d 1231, 1248-49 (Pa. Super. 2015) (finding waiver of appellant's sufficiency and weight challenges where the Pa.R.A.P. 1925 statement was too vague to permit the court to identify (1) which crimes, or the elements of any crimes, that the Commonwealth allegedly failed to prove beyond a reasonable doubt; or (2) which verdicts were contrary to the weight of the evidence, and the specific reasons why the

verdicts were contrary to the weight of the evidence). Any attempt by the trial court to correctly identify and address weight and sufficiency issues does not affect our finding of waiver. **Commonwealth v. LeClair**, 236 A.3d 71, 76 (Pa. Super. 2020).

Here, Appellant preserved the weight claim by raising it in a post-sentence motion. However, he did not specify in his concise statement which of his three convictions he believes were against the weight of the evidence. His concise statement asserts only that "the trial court err[ed] in failing to grant a new trial where the verdict was against the weight of the evidence . . . ." Appellant's 1925(b) Statement, 12/28/22. In **Commonwealth v. Rogers**, 250 A.3d 1209, 1225 (Pa. 2021), our Supreme Court held that appellate courts may reach the merits of a weight claim, notwithstanding the brevity of a Rule 1925(b) statement, where the trial court has no difficulty apprehending the claim or addressing its substance, and meaningful appellate review is unhampered. **Id**. Here, Appellant's post-sentence motion states that "the verdict convicting Mr. Bentley of second-degree murder, robbery, and criminal conspiracy to commit robbery was so against the weight of the evidence as to shock the conscience." Post-Sentence Motion, 10/24/22, at 4 (unnumbered). He further specifies which evidence he believes was inconsistent or contradictory, resulting in the verdicts begin against the weight of the evidence. **Id**. Thus, we will address the merits.

Appellant asserts that his conviction is against the weight of the evidence because his brother, who was not present for the robbery, testified

- 14 -

to facts of the robbery as they were apparently relayed to him by Appellant in the days following it, but Appellant denied having a conversation with his brother about the incident. Appellant's brother testified that Appellant received a firearm from Mohammed, but Appellant testified he received the firearm from co-defendant Harrison. Appellant's brother further stated that Appellant's minivan "just stopped working" when Appellant testified it stopped working because an individual was shooting at it. Appellant's Br. at 24. Appellant contends that these inconsistencies prove he never spoke with his brother about the robbery and thus his brother was not to be believed.

The record reflects that Appellant's brother testified correctly to most of the details of Appellant's robbery. During Appellant's cross-examination, he admitted that his brother had most of the details correct including the relationship between Appellant and his co-defendant, that he shaved his head after the robbery, that he went to Wawa and then fled to North Carolina, that the victim was a weed dealer and had weed on him the day of the robbery, that Appellant shot and killed the victim, and that Appellant used a gun he was handed by one of his co-conspirators. N.T., 10/11/22, at 66-73. The trial court quotes portions of Appellant's cross-examination and states in its opinion,

> The testimony brought out on cross-examination shows that [Appellant's brother]'s testimony was not inaccurate and not riddled with inconsistencies. Quite the opposite, his testimony showed that he knew most of the pertinent details, despite getting a few wrong. This undercut Appellant's testimony that he did not talk to his brother after the murder. Further, [Appellant's

brother]'s testimony was corroborated by the facts as stated by Harrison. This bolstered [Appellant's brother]'s testimony. Accordingly, the weight of the evidence supported the verdict.

Tr. Ct. Op. at 25.

The trial court did not abuse its discretion in denying Appellant's motion for a new trial because the verdict was not contrary to the weight of the evidence. Appellant's brother's testimony mostly corroborated Daijon Harrison's testimony of the events of the robbery. Although Appellant claimed he never spoke to his brother about the robbery, Appellant's brother claimed to have learned those facts from Appellant. Thus, the jury did not believe Appellant's testimony that he never spoke to his brother about the robbery, which it was free to do. **Cain, supra**. Notwithstanding Appellant's claims that he was unaware of the robbery being planned and carried out around him, the jury did not lend his testimony credibility, and the trial court determined that the facts opposing Appellant's version to events to be of greater weight. Thus, the trial court did not abuse its discretion in denying Appellant's motion for a new trial.

Appellant's fourth claim is that the trial court erred in admitting prior bad acts of Appellant. Appellant's Br. at 25. Specifically, he contends that the Commonwealth introduced evidence that the van used during the robbery had been stolen ten days prior but did not produce any evidence that Appellant knew of the van's stolen status. **Id**.

Our standard of review over evidentiary matters is well-settled: "[the] admission of evidence is a matter vested in the sound discretion of the trial

court, whose decision thereon can only be reversed by this Court upon a showing of an abuse of discretion." *Commonwealth v. Travaglia*, 792 A.2d 1261, 1263 (Pa. Super. 2002), appeal denied, 815 A.2d 633 (Pa. 2002), cert. denied, 540 U.S. 828, (2003) (citation omitted).

> Evidence of prior bad acts committed by a defendant is not admissible solely to show the defendant's bad character or his propensity for committing bad acts. However, evidence of prior bad acts is admissible where there is a legitimate reason for the evidence, such as to establish motive. In order for evidence of prior bad acts to be admissible as evidence of motive, the prior bad acts must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances. In weighing whether evidence of prior bad acts will be admissible, however, the trial court must still weigh the relevance and probative value of the evidence against the prejudicial impact of that evidence.

*Commonwealth v. Dowling*, 883 A.2d 570, 578 (Pa. 2005) (internal citations and quotation marks omitted).

Furthermore, our courts have long recognized the special significance of evidence which provides jurors with the *res gestae*, or complete history, of a crime. *Commonwealth v. Paddy*, 800 A.2d 294, 308 (Pa. 2002). In *Paddy*, our Supreme Court permitted the introduction in the Commonwealth's case-in-chief of prior bad acts, even though the evidence was clearly prejudicial to the accused:

> the [trial] court is not . . . required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged.

*Id.* (citation and quotation omitted). The court reasoned that this *res gestae* evidence was necessary for the jurors to be able to evaluate properly the totality of the evidence, and further, to be able to draw accurate inferences therefrom. *Id*. Instantly, our scope of review is limited to an examination of the trial court's stated reason for its decision to allow the admission testimony that the van used in the robbery had been stolen. ***Commonwealth v. Minerd***, 753 A.2d 225, 229 (Pa. 2000).

Here, the van that was driven by Appellant in committing the robbery had been reported stolen ten days prior. N.T., 10/10/22, at 55. Two mentions of the van's stolen status were made during trial: First, Detective Hatfield testified that she reviewed the video, and a license plate reader was used to determine based on the license plate that the van used to flee the scene was stolen. N.T., 10/7/22, at 92-93. Officer Pistilli testified that when he located the van abandoned in a driveway and ran its registration, it came back stolen. N.T., 10/10/22, at 54-55.

Our review of the trial court's stated reason for admitting this evidence reveals that the trial court deemed the van's stolen status to be relevant to the natural unfolding of events:

> Officer Pistilli testified how he responded to the call of an abandoned vehicle, and his attempts to identify what the vehicle was doing at that location. In doing so, he testified how he ran the registration. It was only a natural way of discussing the results of his attempt to investigate the abandoned vehicle, to explain the results of running the registration.

Tr. Ct. Op. at 29.

- 18 -

Here, the trial court classified the van's stolen status as evidence of a prior bad act, but justified the admission of the evidence based on the *res gestae* exception. We do not agree that the fleeting mentions of the van's stolen status were evidence of a prior bad act of Appellant thereby requiring an exception or another legitimate reason to be admitted. "Evidence of prior bad acts *committed by a defendant* is not admissible solely to show the defendant's bad character or his propensity for committing bad acts. However, evidence of prior bad acts is admissible where there is a legitimate reason for the evidence . . . ." **Dowling, supra** (emphasis added). That a van was stolen is evidence of a crime, wrong, or bad act on the part of some individual, but not necessarily Appellant or his co-defendants. No testimony regarding the stolen van by either Detective Hatfield or by Officer Pistilli tended to attribute the theft of the van to Appellant. Appellant was not charged with theft of the van or receiving stolen property. No allusions were made by the Commonwealth or its witnesses that Appellant had knowledge of the van's stolen status. The fact that the van was stolen served only to complete the story for the jurors as to the reason for and result of Officer Pistilli running the vehicle's registration.

Moreover, the trial court *twice* gave a cautionary instruction to the jury regarding the use of this evidence; one instruction was given after Officer Pistilli's testimony about it, and one was given before the jury began deliberations. N.T., 10/10/22, at 55; N.T., 10/11/22, at 171-72. The trial court's first cautionary instruction stated this:

- 19 -

Let me give the instruction there. This defendant is not charged with any crime related to stealing the van or receiving stolen property, but the evidence is admissible to tell you the natural development of the facts in this case and the complete story. You should consider this evidence for that purpose only. You must not consider it as evidence that would tend to show that the defendant is a person of bad character, or criminal tendencies from which you might be inclined to infer guilt.

N.T., 10/10/22, at 55. The second instruction advised the jury:

You've heard evidence concerning other acts that the defendant is not charged with, for example, whether the car was stolen, whether it was a receiving stolen property situation, and then you heard about drug activity on the day in question. Once again, the defendant is not charged with these things. It's introduced to allow you to understand the whole story of the case, the natural development of the facts. It may not be considered by you in other ways such as you may not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.

N.T., 10/11/22, 171-72.

It is well established that it is possible to eradicate any prejudice resulting from reference to prior criminal activity through a curative instruction to the jury. *See Commonwealth v. Haag*, 562 A.2d 289, 295 (Pa. 1989) ("where the Commonwealth did not deliberately elicit the reference to a prior unrelated crime, did not exploit the reference, and introduced no evidence of the prior unrelated crime, a prompt curative instruction is sufficient to negate any prejudice which may have resulted."). Juries are presumed to follow a court's instruction including an instruction that certain matters are not to be considered for certain purposes. *Commonwealth v. Rivera*, 715 A.2d 1136, 1139 (Pa. Super. 1998). Thus, we find that the court did not abuse its

discretion in admitting the evidence that the van was stolen because it was not evidence of a prior bad act *of Appellant's* and because there was no prejudice to Appellant.

Appellant's sixth issue is that the trial court erred in denying Appellant's motion *in limine* to exclude the audio portion of the video footage of the robbery wherein a declarant identified Appellant. Appellant's Br. at 28.

Our standard of review of a denial of a motion *in limine* is as follows:

> When ruling on a trial court's decision to grant or deny a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

*Commonwealth v. Moser*, 999 A.2d 602, 605 (Pa. Super. 2010) (citation omitted).

At trial, the audio portion of the video footage showing the robbery was admitted. In the footage, Quadir Nixon can be heard saying, "Jig, Mir, and (unintelligible) is just robbing County right now on the corner bro. They just gunned him down right now, bro. He got the gat to County right now, bro."[2] Motion *in Limine*, 7/29/22, at 2. Appellant's nickname is Mir, so the statement implicated him, but the Commonwealth did not call Quadir Nixon, the declarant in the audio, as a witness. Appellant asserts that the audio

---

[2] "Jig" is the nickname for Nafis Hawkins. "Mir" is the nickname for Appellant, Samir Bentley. "County" is the nickname for the victim, Robert Stiles. A "gat" is a gun.

identification was hearsay and fails to meet the statement of identification exception because the declarant was never called as a witness to be questioned about making the identification. Appellant's Br. at 29.

Hearsay is defined as an out-of-court statement offered for the truth of the matter asserted, and it is generally inadmissible unless it falls within an exception to the hearsay rule set forth in the Pennsylvania Rules of Evidence. ***Commonwealth v. Manivannan***, 186 A.3d 472, 482 (Pa. Super. 2018) (citing ***Commonwealth v. Mosley***, 114 A.3d 1072, 1084 (Pa. Super. 2015); Pa.R.E. 801 and 802). There is an exception for statements made for the purpose of identification:

> The following statements are not excluded by the rule against hearsay if the *declarant testifies and is subject to cross-examination* about the prior statement: . . . A prior statement by a declarant-witness identifying a person or thing, made after perceiving the person or thing, *provided that the declarant-witness testifies* to the making of the prior statement.

Pa.R.E. 803.1(2) (emphasis added).

Here, the trial court concluded that the statements made by Nixon in the audio recording were admissible under the excited utterance and the present sense impression exceptions to hearsay. Tr. Ct. Op. at 32. Our Supreme Court has consistently defined "excited utterance" as:

> [A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and

place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.

***Commonwealth v. Keys***, 814 A.2d 1256, 1258 (Pa. Super. 2003). The present sense impression exception has been characterized as follows:

> This exception requires that the declarant see the event and make an observation about it to another person also present at the scene; the observation must be made at the time of the event, or so shortly thereafter that it is unlikely that the declarant had the opportunity to form the purpose of misstating his observation. Commentators have generally characterized the occurrence giving rise to the declaration as an unexciting event. Reliability is considered assured by the contemporaneousness of the statement, and by the fact that the observation is made to another person.
>
> The Supreme Court has observed further that[] under this exception the necessity for the presence of a startling occurrence or accident to serve as a source of reliability is not required. The truthfulness of the utterance is dependent upon its spontaneity. It must be certain from the circumstances that the utterance is a reflex product of immediate sensual impressions, unaided by retrospective mental processes. Restated, the utterance must be "instinctive, rather than deliberate."

***Commonwealth v. Harper***, 614 A.2d 1180, 1183 (1992) (internal citations and quotation marks omitted).

The present sense impression exception applies to "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Pa.R.E. 803(1). The rationale for the present sense impression exception is that the "[r]elative immediacy of the declaration ensures that there will have been little opportunity for reflection or calculated misstatement." ***Commonwealth v. Coleman***, 326 A.2d 387, 389 (Pa. 1974). For example, a call to 911 may qualify as a present sense impression if the statement is reported contemporaneously with the event or is so

instantaneous "that it is unlikely that the declarant had the opportunity to form the purpose of misstating his observation." **Commonwealth v. Cunningham**, 805 A.2d 566, 573 (Pa. Super. 2002). The excited utterance exception applies to "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Pa.R.E. 803(2). Thus, "[t]he spontaneity of such an excited declaration is the source of reliability and the touchstone of admissibility." **Coleman**, 326 A.2d at 389.

In explaining its reasons for denying the motion *in limine*, the trial court stated:

> This [c]ourt rejected defense counsel's position, because it is simply not the law and **Cordona, supra**, does not support his position. While the persuasive case does stand for the proposition that under Pa.R.E. 803.1(2), the hearsay exception, "prior statement of identification by declarant-witness" does require the declarant to testify at trial and that the declarant has to also testify to making the prior statement; it does not stand for the proposition that defense counsel suggested. When a party invokes a hearsay exception, a court must ascertain whether the proffered statement meets the exacting demands of the exception. That is exactly what occurred here. The Commonwealth invoked both the presence sense impression and excited utterance hearsay exceptions. The Commonwealth detailed how the statement fit both the present sense impression, and the excited utterance exception. This [c]ourt agreed with this analysis.

Tr. Ct. Op. at 33.

We agree. Because Nixon was the declarant of the out-of-court statement and was not called as a witness, the statement in the audio recording is hearsay and must have satisfied a hearsay exception in which the

declarant's availability is immaterial—i.e., an exception enumerated in Pa.R.E. 803— in order to have been properly admitted. The trial court found the exceptions in Pa.R.E. 803(1) and 803(2) to be satisfied.

However, we need not perform an independent analysis to determine if the trial court abused its discretion in finding that the present sense impression and excited utterance exceptions were met because Appellant did not challenge on appeal the finding that the statements satisfied the present sense impression and/or excited utterance exceptions. He devoted his argument entirely to the point that the Commonwealth needed to additionally meet the more stringent requirement for statement of identification, requiring the declarant testify in court to the statement made for the purpose of identification, which it did not. Appellant's Br. at 28-30. That is not the law; one layer of hearsay requires one hearsay exception for the evidence to be admissible, and no additional hearsay exception is required to be met. *See Commonwealth v. Harris*, 658 A.2d 392, 394 (Pa. Super. 1995) (murder victim's statement identifying appellant was admissible as present sense impression where it gave a "contemporaneous verbalization of her observation" of him outside her door); *see also Commonwealth v. Kulb*, 220 A.3d 652, 2019 Pa. Super. Unpub. LEXIS 2694 at *10 (Pa. Super. 2019)[3] (witnesses' statements identifying Appellant were properly considered excited

_____

[3] We note that, pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value. We find guidance in the unpublished memorandum cited *supra* and find it to be persuasive in this matter.

utterances and admitted under that exception to the hearsay rule); ***see also***

***Commonwealth v. Harper***, A.2d 1180, 1183 (Pa. Super. 1992) (although

declarant identified appellant's clothing, the observation was relayed as a

present sense impression and thus admissible); ***see also Commonwealth v.***

***Holton***, 906 A.2d 1346, 1250, 1253 (Pa. Super. 2006) (when a detective

wearing a hidden wire bought drugs from a woman, the audio tape was

admissible without the woman's testimony under the co-conspirator

exception, which does not require availability of the declarant as a witness,

despite the woman identifying appellant as her drug dealer in the audio

recording). Accordingly, the audio was properly admitted and Appellant's

claim fails.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/4/2024