J-S35032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CLAYTON R. PRATT | : | |
| | : | |
| Appellant | : | No. 319 MDA 2024 |

Appeal from the Judgment of Sentence Entered September 29, 2023
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0000493-2021

BEFORE:  PANELLA, P.J.E., MURRAY, J., and KING, J.

MEMORANDUM BY KING, J.:                **FILED: JANUARY 17, 2025**

Appellant, Clayton R. Pratt, appeals from the judgment of sentence entered in the York County Court of Common Pleas, following his jury trial convictions for delivery of a controlled substance, drug delivery resulting in death ("DDRD"), and criminal conspiracy to commit DDRD.[1]  We affirm.

The relevant facts and procedural history in this case are as follows.  On April 24, 2020, Oshakee[2] Zink and the victim, Meisha Baer, were hanging out together and decided to do some cocaine.  The victim reached out to her friend, Cody Gemmill, and asked him to come over and to bring some cocaine.  (N.T. Trial, 8/7/23, at 123-24).  Gemmill was living with Appellant at the time

---

[1] **See** 35 P.S. § 780-113(a)(30), 18 Pa.C.S.A. §§ 2506(a) and 903, respectively.

[2] The record also refers to Ms. Zink's first name as "Oshaakee."

and the two men agreed to go buy some cocaine so that they, along with the victim and her friend, could party and get high. Appellant provided $100.00 of his money to buy the drugs; however, Gemmill, who knew the drug dealer, went into the address and made the purchase. (*Id.* at 109). The two men then brought the drugs with them to the victim's apartment.

Appellant, Gemmill, Zink, and the victim were all partying and drinking together at the victim's apartment when Appellant cut the drugs into lines for everybody to snort. (*Id.* at 83, 111, 131-32). Immediately after snorting the drugs, Zink realized that it was not cocaine and kicked Appellant and Gemmill out of the apartment for failing to bring the correct drugs. (*Id.* at 112-13). That evening Zink fell asleep on the couch and the victim passed out in the kitchen. Zink awoke at about 3:00 a.m. the morning of April 25, 2020, and found the victim dead on the kitchen floor. (*Id.* at 83). She called the police and, upon their arrival, told police about the drugs that they had consumed, which were brought by Appellant and Gemmill. Zink was secured at the scene as a possible witness and later transported to police barracks where officers interviewed her. She returned to police barracks on April 28, 2020, three days later, for another interview and gave a second statement in response to police questioning.

After Zink notified police about their involvement, officers tracked down both Appellant and Gemmill. Police interviewed Appellant, who admitted that both he and Gemmill wanted to party with the girls, and that they had

purchased the drugs somewhere in York. Appellant stated that he had given Gemmill $100.00 to purchase the drugs, and he remained in the car while Gemmill went out to pick up the drugs. Thereafter, Appellant explained that he and Gemmill went to the victim's apartment, where he cut the drugs into lines for everyone. (*Id.* at 109, 204). Police arrested Appellant and charged him with involuntary manslaughter, delivery of a controlled substance, DDRD, and conspiracy.

On September 26, 2022, Appellant filed a motion *in limine* seeking admission of Zink's two recorded police statements. Notably, Zink had died of an unrelated drug overdose after the events at issue and was unavailable to testify at trial. Appellant asserted that Zink's statements were admissible under Pa.R.E. 804(b)(1) because her police interrogation was the equivalent of a deposition, or alternatively, the statements were admissible under the excited utterance exception per Pa.R.E. 803(2).[3] Appellant filed a supplemental motion *in limine* on September 30, 2022, arguing that Zink's statements were admissible under the statement against interest exception to the hearsay rule per Pa.R.E. 804(b)(2). Following the appointment of new counsel, Appellant filed an additional supplemental motion *in limine* incorporating the prior motions and arguing that the statements were also admissible under the present sense impression exception per Pa.R.E. 803(1).

_____

[3] Appellant also filed a motion to sever his case from co-defendant Gemmill, in the event that the motion *in limine* was denied.

The trial court conducted a hearing on the motions *in limine* on November 17, 2022. The trial court denied the motions on January 12, 2023, finding that Zink's statements were not admissible on any of the proffered grounds. Appellant's jury trial commenced on August 7, 2023.[4] The Commonwealth introduced Appellant's April 25, 2020 statement to police, wherein Appellant admitted that he and Gemmill drove to York City to purchase drugs, and that Appellant supplied $100.00 to purchase cocaine. Appellant explained to the officer in that statement that after he ingested the drug, it was obvious to Appellant that it was not cocaine and, based on his prior drug use, he felt it was more fentanyl or heroin based. (N.T. Trial, 8/7/23, at 110).

At trial, Nadine Koenig testified as an expert in the field of toxicology. She explained that the victim's blood alcohol level was at 0.11% and the victim had 15.8 nanograms per milliliter of fentanyl in her blood. Ms. Koenig explained that a lethal dosage of fentanyl can be as little as 3 nanograms per milliliter. (N.T. Trial, 8/8/23, at 148-50). Ms. Koenig testified that the victim's blood also had 1,127 nanograms per milliliter of sertraline (a.k.a. Zoloft), which was below the lethal dosage, but above the therapeutic range. Dr. Edward Mazuchowski, an expert in forensic pathology, then testified that the

---

[4] Co-defendant Gemmill entered a guilty plea at the start of trial on August 7, 2023. The court thereafter entered an order on the record explaining that any relief requested in the motion to sever was denied.

cause of death for the victim was mixed substance toxicology, here a combination of ethanol (alcohol), fentanyl, and sertraline. Dr. Mazuchowski opined he has never seen someone die from the amount of sertraline that was present in victim's system, but he has seen deaths occur based on the amount of fentanyl that was present in victim's system. (*Id.* at 173).

At the end of trial, on August 8, 2023, the jury returned a not guilty verdict on involuntary manslaughter, and a guilty verdict on delivery of a controlled substance, DDRD, and criminal conspiracy. The court ordered a presentence investigation ("PSI") report and on September 29, 2023, after reviewing the PSI as well as the information introduced at the sentencing hearing, the court imposed standard range sentences for each offense. The court imposed the sentence for DDRD and conspiracy consecutively, resulting in an aggregate sentence of 16 to 32 years' imprisonment.

Appellant filed a timely post-sentence motion challenging the weight and sufficiency of the evidence, as well as the imposition of consecutive sentences. The court denied the post-sentence motion on February 21, 2024, and this timely appealed followed. Pursuant to the court's order, Appellant filed his concise statement of errors complained of on appeal on March 22, 2024.

Appellant raises the following issues on appeal:

> I. Whether the [trial] court erred in denying Appellant's motion *in limine* to admit statements by Oshakee Zink as an exception to the hearsay rule, specifically as an excited utterance, present sense impression and/or a statement against interest.

II. Whether the evidence was insufficient to support the jury verdict as to [DDRD], delivery of [a controlled substance,] and criminal conspiracy [DDRD] in that the Commonwealth did not prove beyond a reasonable doubt that the Appellant made a delivery of drugs to the victim.

III. Whether the evidence was insufficient to support the jury verdict as to [DDRD] and criminal conspiracy [DDRD] in that the Commonwealth did not prove beyond a reasonable doubt that fentanyl was a substantial factor in the cause of death.

IV. Whether the verdict as to [DDRD], delivery of [a controlled substance,] and criminal conspiracy [DDRD] was against the greater weight of the evidence which established Appellant did not deliver drugs to the victim.

(Appellant's Brief at 4) (unnecessary capitalization omitted; questions re-organized for purposes of disposition).

In his first issue, Appellant challenges the court's evidentiary ruling on his pretrial motions *in limine* to admit the two statement that Zink gave to police. Appellant concedes that the statements were hearsay but argues that they were still admissible under various exceptions to the rule against hearsay. We will consider each of Appellant's arguments in this issue separately.

First, Appellant claims that Zink's statement made at the police barracks on April 25, 2020 was admissible as a present sense impression because her statement was made near or contemporaneously to her discovery that her friend had died. Appellant insists that although Zink made the statement about three hours after the startling event, she was still perceiving the unsettling event of finding her friend dead. Appellant also argues this

- 6 -

statement was admissible as an excited utterance. He claims that only a small amount of time had elapsed between when Zink found the victim dead and the statement, and Zink was still under the stress of finding her friend at the time she talked to the police officers. Appellant emphasizes that Zink vomited twice during the interview. Appellant insists that because of the court's evidentiary error, he is entitled to a new trial. We disagree.

Our standard of review of a trial court's admission or exclusion of evidence is well established and very narrow:

> Questions concerning the admissibility of evidence are within the sound discretion of the trial court and we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. If in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. LeClair*, 236 A.3d 71, 78 (Pa.Super. 2020), *appeal denied*, 664 Pa. 546, 244 A.3d 1222 (2021) (quoting *Commonwealth v. Belknap*, 105 A.3d 7, 9-10 (Pa.Super. 2014)). Further, our scope of review in cases where the trial court explains the basis for its evidentiary ruling is limited to an examination of the stated reason. *Commonwealth v. Stephens*, 74 A.3d 1034, 1037 (Pa.Super. 2013). "We must also be mindful that a discretionary ruling cannot be overturned simply because a reviewing court disagrees with the trial court's conclusion." *Commonwealth v.*

- 7 -

***O'Brien***, 836 A.2d 966, 968 (Pa.Super. 2003), *appeal denied*, 577 Pa. 695, 845 A.2d 817 (2004).

Pennsylvania Rule of Evidence 801 defines hearsay as follows:

**Rule 801. Definitions That Apply to This Article**

**(a)   Statement.** "Statement" means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.

**(b)   Declarant.** "Declarant" means the person who made statement.

**(c)   Hearsay.** "Hearsay" means a statement that

(1)   the declarant does not make while testifying at the current trial or hearing; and

(2)   a party offers in evidence to prove the truth of the matter asserted in the statement.

Pa.R.E. 801.

Pennsylvania Rule of Evidence 803 sets forth exceptions to the rule against hearsay, in pertinent part, as follows:

**Rule 803.   Exceptions to the Rule Against Hearsay— Regardless of Whether the Declarant Is Available as a Witness**

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

**(1)   Present Sense Impression.** A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it.  When the declarant is unidentified, the proponent shall show by independent corroborating evidence that the declarant actually perceived the event or condition.

> **(2)** **Excited Utterance**.   A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused. When the declarant is unidentified, the proponent shall show by independent corroborating evidence that the declarant actually perceived the startling event or condition.
>
> *   *   *

Pa.R.E. 803(1)-(2).

"*Res gestae* statements, such as excited utterances [and] present sense impressions … are normally excepted out of the hearsay rule, because the reliability of such statements are established by the statement being made contemporaneous with a provoking event." ***Commonwealth v. Murray***, 623 Pa. 506, 539, 83 A.3d 137, 157 (2013) (citation omitted).

This Court has explained:

> The present sense impression exception to the hearsay rule permits testimony of declarations concerning conditions or non-exciting events observed by the declarant. ***Commonwealth v. Harper***, [614 A.2d 1180, 1183 (Pa.Super. 1992)], *appeal denied*, 533 Pa. 649, 624 A.2d 109 (1993). The observation must be made at the time of the event or so shortly thereafter that it is unlikely that the declarant had the opportunity to form the purpose of misstating his observation. ***Commonwealth v. Blackwell***, [494 A.2d 426, 431 (Pa.Super. 1985)].

***Commonwealth v. Cunningham***, 805 A.2d 566, 573 (Pa.Super. 2002).

Regarding the excited utterance exception, our Supreme Court has stated:

> While the excited utterance exception has been codified as part of our rules of evidence since 1998, **see** Pa.R.E. 803(2), the common law definition of an excited utterance remains

applicable, and has been often cited by this Court:

> [A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which [s]he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from h[er] reflective faculties…. Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event.
>
> The circumstances surrounding the statements may be sufficient to establish the existence of a sufficiently startling event.

*Murray, supra* at 540-41, 83 A.3d at 157-58 (internal citations omitted).

Further, Pennsylvania courts "have not established a bright line rule regarding the amount of time that may elapse between the declarant's experience and her statement." *Commonwealth v. Gray*, 867 A.2d 560, 570 (Pa.Super. 2005), *appeal denied*, 583 Pa. 694, 879 A.2d 781 (2005). "Rather, the crucial question, regardless of time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance." *Id.* at 570-71 (internal quotation marks omitted).

In *Commonwealth v. Rivera*, 238 A.3d 482 (Pa.Super. 2020), *appeal denied*, 666 Pa. 97, 250 A.3d 1158 (2021), this Court considered whether

statements made by the victim's daughter hours after a shooting, and in response to a police interview, constituted excited utterances. This Court explained that although the initial event was startling, the daughter's statements were taken hours after the event, in a different location, and were in response to police questioning, and the daughter was incredibly composed and responsive during the interview. As such, this Court agreed with the trial court that the statement made during the interview did not qualify as an excited utterance. *Id.* at 495.

Instantly, with respect to the present sense impression exception, the trial court explained:

> [G]iven that the first statement was given by Zink two or more hours after the victim was discovered and was given at the police barracks in response to specific questions by the trooper and not contemporaneously at the scene upon discovery of the victim's body, this [c]ourt finds that the statement does not meet the requirements of a present sense impression exception to the hearsay rule.

(Trial Court Opinion, 1/12/23, at 8-9). The court also discussed the excited utterance exception, and explained:

> In the present case, defense counsel identifies the startling event as the discovery by Zink of the victim's dead body. This occurred sometime near 3:20 a.m., before PSP was dispatched to the residence. Police arrived on scene at approximately 4:18 a.m. After securing evidence at the scene, PSP transported Zink to the York Barracks at 6:11 a.m. and took her statement. Upon review of the first police interview of Zink, [the trial c]ourt finds that any nervous excitement that may have existed had dissipated. Zink's responses were given to direct questions asked by the trooper and, usually, after a pause and some internal reflection before responding. Twice during the interview,

- 11 -

> Zink indicated she was feeling ill presumably from the after-effects of the drugs she ingested. Her only spontaneous statement that related to the startling event was made at the start of the interview when she was tearful and exclaimed "I just don't understand." The remainder of the questioning led her through a timeline of the previous evening until she ingested drugs, passed out and did not recall what happened thereafter.

(Trial Court Opinion, 1/12/23, at 6-7) (record citations omitted).

Upon review, we agree that Zink's April 25, 2020 statement falls under neither the present sense impression nor the excited utterance exception to the hearsay rule. The record shows that although Zink made her statement after awaking to find the victim had died, her statement was given hours after the event and in response to questioning during a police interview. The statement was not made at the time of the event or so shortly thereafter that it is unlikely that the declarant had the opportunity to form the purpose of misstating her observation. *See Cunningham, supra*.

Furthermore, we agree with the trial court that at the time of the April 25, 2020 statement, approximately three hours after finding the victim's body, any initial nervous excitement would have dissipated. Zink was at police barracks while giving her statement and, aside from stating "I just don't understand," the rest of her statement to police was made in response to police questioning. It was not a spontaneous response to a startling event. *See Murray, supra*. Indeed, Zink's having been sick while giving the statement was just as likely to have been the result of withdrawal from the drugs she had consumed the day before as it was shock over seeing her

friend's body. As such, we conclude that the trial court did not abuse its discretion when it found that Zink's statements did not meet either the present sense impression or excited utterance exceptions to the rule against hearsay. *See LeClair, supra*.

Appellant also argues that Zink's statements to police were admissible under Pa.R.E. 804, providing exceptions to the rule against hearsay for when the declarant is unavailable. Appellant claims that both of Zink's statements to police on April 25, 2020 and April 28, 2020, were admissible as statements against interest. Appellant contends that Zink implicated herself in criminal activity by ingesting drugs, specifically that she may have exposed herself to charges of possessing controlled substances or DDRD. Appellant concludes that the trial court erred in its evidentiary ruling, and he is entitled to a new trial. We disagree.

The Rules of Evidence set forth the exceptions to the rule against hearsay when the declarant is unavailable as follows:

> **Rule 804. Exceptions to the Rule Against Hearsay— When the Declarant is Unavailable as a Witness**
>
> \* \* \*
>
> **(b) The Exceptions.** The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> \* \* \*
>
> (3) *Statement Against Interest*. A statement that:
>
> > (A) a reasonable person in the declarant's position

would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

(B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Pa.R.E. 804(b)(3).  Our Supreme Court has noted four criteria which must be met under Rule 804(b)(3):

(1) the declarant made a statement; (2) the declarant was, at the time of trial, unavailable as a witness; (3) the statement "at the time of its making ... so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true;" and, as this is a criminal matter (4) "corroborating circumstances clearly indicate the trustworthiness of the statement." Pa.R.E. 804(b)(3).

*Commonwealth v. Brown*, 617 Pa. 107, 168, 52 A.3d 1139, 1176 (2012).

Notably, only the portion of the statement which is against the declarant's interest is admissible, portions that do not implicate the declarant are inadmissible even if they form part of the narrative.  *Id.* at 175-76, 52 A.3d at 1181.

Instantly, the trial court explained its conclusion that neither the April 25, 2020 nor the April 28, 2020 statements met the requirements for statements against interest, as follows:

The defense motion asserts that the statement against interest surrounds Zink's admission that she ingested drugs

- 14 -

and thus committed the crime of possession of a controlled substance. There has been no evidence of corroborating circumstances offered … however to support the trustworthiness of the statement. Nor would the admission by Zink to the crime of possession of a controlled substance alone, provide any relevant evidence to the trier of fact, other than drugs were present on the scene the night the victim died.

Moreover, the admission of ingestion of drugs cannot be expanded as defense counsel suggests into releasing the entirety of Zink's statement into evidence. To do such would violate the confrontation clause of the sixth amendment of the Constitution. As set forth above, neither [Appellant] nor [Gemmill] have had the opportunity to cross-examine Zink. …

[The trial c]ourt finds that the indicia of reliability cannot be found in Zink's statement given her untimely death and unavailability and the lack of opportunity for cross-examination.

(Trial Court Opinion, 1/12/23, at 9-11).

We agree with the trial court's evidentiary ruling. Notably, even if the statements concerning Zink's ingestion of drugs were corroborated, only the portions of those statements which would incriminate Zink would have been admissible, not the statements in their entirety. Appellant has not acknowledged this requirement in his brief. Appellant chose not to parse out the statements into specific portions that he argues would have been admissible as statements against Zink's interest. Hence, even if some individual statements within were corroborated and against Zink's penal interest, Appellant sought only to admit the entirety of the statement. *See Brown, supra*. On this record, we cannot say that the trial court abused its

discretion in denying Appellant's motion *in limine* on this ground.  **See LeClair, supra**.  Therefore, Appellant's first issue on appeal is meritless.

In his second issue, Appellant argues that the evidence was insufficient to support the jury's verdict of DDRD, delivery of a controlled substance, and criminal conspiracy.  Specifically, Appellant asserts that the Commonwealth did not prove beyond a reasonable doubt that he delivered drugs to the victim.  Appellant claims that the evidence at trial established that he had not communicated with the victim at all regarding the purchase of drugs.  Rather, he insists that Gemmill was involved in arranging the purchase and Gemmill physically delivered the drugs by placing them on the counter in the victim's apartment.  Appellant contends that his cutting up lines for all persons to use does not make him a principal or accomplice to having actually delivered the drugs.  Relying on **Commonwealth v. C. Brown**, 297 A.3d 755 (Pa.Super. 2023) (unpublished memorandum),[5] Appellant argues that rather than having delivered the drugs, he should instead be seen as a joint purchaser who intended to share the drugs, and therefore could only possibly have been convicted of simple possession.  (**See** Appellant's Brief at 15-16).  Appellant insists that the victim initiated the purchase of the drugs via Gemmill, and at this point, all four individuals became joint purchasers of the drugs for personal use and therefore could not deliver the drugs among themselves.

_____

[5] **See** Pa.R.A.P. 126(b) (stating that unpublished decisions of this Court filed after May 1, 2019 may be cited for their persuasive value).

- 16 -

Appellant concludes the evidence was insufficient to sustain his convictions on these grounds, and this Court must grant relief. We disagree.

When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Jackson*, 215 A.3d 972, 980 (Pa.Super. 2019) (quoting

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super. 2011), *appeal*

*denied*, 613 Pa. 642, 32 A.3d 1275 (2011)).

The Crimes Code defines the offense of DDRD as follows:

**§ 2506. Drug Delivery Resulting in Death**

**(a) Offense defined.**—A person commits a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance

- 17 -

> in violation of … The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S.A. § 2506(a). Thus, to prove DDRD, the Commonwealth must establish: 1) the defendant administered, dispensed, delivered, gave, prescribed, sold, or distributed a controlled substance or a counterfeit controlled substance to a person; 2) the defendant did so intentionally; 3) the administration, dispense, delivery, prescription, sale, or distribution was in violation of the Controlled Substance, Drug, Device and Cosmetic Act; and 4) a person died as a result of using the substance. ***Commonwealth v. Peck***, 663 Pa. 484, 495, 242 A.3d 1274, 1280 (2020).

> The offense of delivery of a controlled substance is provided for in section 780-113(a)(30) of The Controlled Substance, Drug, Device and Cosmetic Act…. According to that section, the offense occurs in the following circumstances:
>
>> Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.
>
> 35 P.S. § 780–113(a)(30).

***Commonwealth v. Murphy***, 577 Pa. 275, 284-85, 844 A.2d 1228, 1233 (2004) (footnote omitted).

> Significantly, the Drug Act defines "deliver" and "delivery" as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, other drug, device or cosmetic whether or not there is an agency relationship." 35 P.S. § 780-102. Based upon the common

> meaning of the term "transfer," our Supreme Court has held that a person "actually transfers drugs whenever he physically conveys drugs to another person." [**Murphy, supra** at 285, 844 A.2d at 1233-34]; **see also** 1 Pa.C.S. § 1903(b) (requiring courts, in general, to construe statutory words and phrases according to their common and approved usage). An exchange of money or something of value is not required; "all that is necessary is that the transfer be between two people." **Commonwealth v. Metzger**, [372 A.2d 20, 22 (Pa.Super. 1977)].

**Commonwealth v. Scott**, 325 A.3d 844, 851–52 (Pa.Super. 2024) (footnote omitted).

With respect to conspiracy to commit DDRD, this Court has explained that "when conspiring to engage in certain conduct, conspirators need not contemplate the ultimate crime in order to be charged and convicted of conspiracy to commit that crime." **Commonwealth v. Carr**, 227 A.3d 11, 17 (Pa.Super. 2020).

> [W]ith regard to conspiracy to commit drug delivery resulting in death, a drug user's death need not be the objective of the conspirators because the consequence of an overdose is a foreseeable result of the delivery, distribution, or sale of drugs to the victim. In short, the conspiracy to commit an overt act binds the conspirators to the foreseeable consequences of the conduct. Here, the conspiring parties need not specifically anticipate the death of the user of the drug. A conspiracy to commit the overt act of an intentional drug delivery links the conspirators to the foreseeable consequence that the drug user may die.

**Id.** at 17–18.

In **Scott, supra**, the evidence established that, in exchange for the victim's money, Scott obtained drugs from his dealer and then delivered the drugs to the victim's friend, who testified that he and the victim planned to

get together and use drugs. The evidence did not suggest that the victim specifically intended to do drugs with Scott, but that the victim and her friend intended to do drugs, and Scott, who purchased the drugs for them, ended up using drugs with the friend.

On appeal, Scott argued that the Commonwealth failed to prove that he delivered drugs to the victim because the individuals involved mutually planned to acquire drugs from Scott's contacts and use them together. This Court noted that while Scott's argument "may have some commonsense appeal, neither the facts of this case nor the current state of Pennsylvania law permit reversal on this basis." **Id.** at 852. This Court **rejected** Scott's suggestion to follow the rational of **C. Brown, supra** and cases arising from other federal and state courts that based on the mutual plan to acquire and use drugs together, Scott did not deliver the drugs within the meaning of the Drug Act. **Id.** at 850-51. This Court noted that the **delivery was established** with the physical conveyance between Scott and the friend as the victim's agent, regardless of the fact that Scott used the drugs as well. Moreover, this Court noted that even if a mutual plan could overcome the physical conveyance, no such plan existed between Scott and the victim. **Id.** at 852.

Instantly, in its order denying Appellant's post-sentence motion, the trial court explained:

> In the instant case, during [Appellant's] first interview with police, he indicated that … Gemmill had the powder (drugs)

in his possession after the purchase and also on the ride to the victim's apartment. However, [Appellant] also said that after they arrived at the victim's apartment, … Gemmill gave [Appellant] the whole thing because [Appellant] ended up paying for it. The fact that [Appellant] paid for all of the drugs purchased is confirmed by his second interview where he indicated that he gave … Gemmill $100.00 to buy the drugs, and that that's all the drugs they bought ($100.00 worth). Moreover, while [Appellant] indicated in that first interview that … Gemmill cut the powder into lines, in his second interview, [Appellant] stated that he ([Appellant]) made the lines to snort, "no question." Since the jury is free to believe all, some, or none of the evidence, it was reasonable for the jury to conclude that: [Appellant] was the one who paid for all of the drugs purchased; [b]ecause [Appellant] paid for the drugs, … Gemmill gave the drugs to [Appellant] at the victim's apartment; and [Appellant] was the one who cut the drugs into lines so that the victim (and everyone else) could ingest the drugs.

The act of cutting the drugs into lines and leaving it on the counter for the victim to ingest constitutes conveyance of the controlled substance from [Appellant] to the victim. Hence, the evidence was sufficient to prove that [Appellant] delivered the drugs to the victim.

(Trial Court Opinion, filed 2/21/24, at 3-4). The trial court explained that this was not a case wherein a mutual plan would negate delivery because the victim in this case did not pay for the drugs, did not go to or from the location for the drug purchase, and did not make the drug purchase. (*Id.* at 5-6).

Upon review, we agree with the trial court that, viewing the evidence admitted at trial in the light most favorable to the Commonwealth as verdict winner, the evidence was sufficient to sustain Appellant's convictions. *See Jackson, supra*. The evidence demonstrated that Appellant accompanied Gemmill to purchase the drugs and solely provided funding for the drugs.

Thereafter, Gemmill gave the drugs to Appellant and Appellant admitted to dividing the drugs for each person and cutting up lines for each person to ingest. On this record, the evidence was sufficient to establish that Appellant transferred the drugs to each individual present, and in doing so, he delivered the drugs.[6] *See Scott, supra*. Thus, the evidence was sufficient to establish the "delivery" element for the offenses of DDRD, delivery of a controlled substance, and conspiracy to commit DDRD. Appellant's claim that the evidence was insufficient to prove that he delivered the drugs is meritless.

In his third issue, Appellant argues that the evidence was insufficient to support his convictions of DDRD and conspiracy to commit DDRD because the Commonwealth did not prove that the fentanyl he supplied was a substantial factor in the victim's cause of death. Appellant claims that the victim also had alcohol above the legal limit and sertraline above the therapeutic range in her blood; therefore, the fentanyl was a contributing factor, but not a direct and substantial primary factor in the victim's cause of death. Appellant insists the evidence was insufficient to support his convictions on this ground, and this Court must grant relief. We disagree.

To establish that an individual is guilty of DDRD, the Commonwealth is

_____

[6] Furthermore, we note that this Court's holding in *Scott* rejected the suggestion in *C. Brown* that the element of delivery is not established where addicts mutually plan to acquire and use drugs together. As *Scott* is a published opinion it is binding on this Court, whereas the unpublished decision in *C. Brown* is not. *See* Pa.R.A.P. 126(b).

- 22 -

required to prove that the victim died as a result of using the delivered substance. **Peck, supra** at 495, 242 A.3d at 1280. To establish that a person died as a result of using the substance, "[t]he statute requires 'but-for' causation such that the defendant's action with the drugs was a direct and substantial factor in producing the death[.]" **Scott, supra** at 850 (some internal quotation marks omitted). "[T]he results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." **Commonwealth. v. Kakhankham**, 132 A.3d 986, 993 (Pa.Super. 2015), *appeal denied*, 635 Pa. 773, 138 A.3d 4 (2016). Nevertheless,

> a defendant's conduct need not be the only cause of the victim's death in order to establish a causal connection[. C]riminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result.

**Commonwealth v. Proctor**, 156 A.3d 261, 271 (Pa.Super. 2017) (internal citation and quotation marks omitted) (holding evidence was sufficient to sustain appellant's DDRD conviction where victim's cause of death was combined drug toxicity as opposed to being caused solely by drug provided by appellant).

Additionally:

> To establish DDRD, the Commonwealth need not prove that the defendant intended to cause the death of another. **See** [**Kakhankham, supra** at 993]. Instead, the Commonwealth must establish that the defendant's act of administering, dispensing, delivering, giving, prescribing,

- 23 -

> selling, or distributing the substance was intentional and
> that the defendant had a "reckless disregard of death from
> the use of the contraband." [**Carr, supra** at 17]….
>
> … Given the inherent dangerousness of consuming fentanyl
> in an unknown strength and the high possibility that death
> could occur, the Commonwealth "satisfies the reckless
> element as to the possibility of death" when the substance
> involved is fentanyl.

**Scott, supra** at 850. Furthermore, "conspiracy to commit the overt act of an intentional drug delivery links the conspirators to the foreseeable consequence that the drug user may die." **Carr, supra** at 17–18.

Instantly, Ms. Koenig testified as an expert in toxicology that the following substances were found in the victim's blood: ethanol at 0.11 percent, fentanyl at 15.8 nanograms/ml, sertraline at 1,127 nanograms/ml; and naproxen (identified but not quantified). (**See** N.T. Trial, 8/8/23, at 142-153). Ms. Koenig explained that fentanyl can be lethal in as little as 3 nanograms/ml. (**Id.** at 149). Ms. Koenig explained that although the amount of sertraline in the victim's blood was above the therapeutic range, the amount of sertraline in the victim's blood was under the lethal amount. (**Id.** at 148, 155). In addition, Dr. Mazuchowski, an expert in forensic pathology, determined that the victim's cause of death was due to the toxic effects of ethanol, fentanyl, and sertraline. He explained that the ethanol, fentanyl, and sertraline were all contributing factors in the victim's death. (**Id.** at 170-172). Dr. Mazuchowski testified that he has seen individuals with the same level of fentanyl as the victim (15.8 nanograms/ml) die with just the fentanyl in their

blood.  (*Id.* at 173).

In its opinion denying Appellant's post-sentence motion, the trial court explained:

> [G]iven that the levels of sertraline and ethanol in the victim's blood were under the lethal limit, and the level of fentanyl in the victim's blood was over 5 times the lethal limit, it was reasonable for the jury to conclude that the fentanyl was a direct and substantial factor in producing the victim's death, even though the sertraline and ethanol combined with the fentanyl to achieve the result.  Hence, "but for" [Appellant] delivering the drugs to the victim, and the victim using those drugs, she would not have died.

(Trial Court Opinion, 2/21/24, at 10-11) (unnecessary capitalization omitted).

Upon review, we conclude that the evidence at trial viewed in the light most favorable to the Commonwealth as verdict winner, established that Appellant delivered drugs to the victim's apartment and the victim died as a result of ingesting those drugs.  As Dr. Mazuchowski explained, the victim's cause of death was mixed substance toxicology—a combination of ethanol, fentanyl, and sertraline, and he had seen people die from the amount of fentanyl that was present in the victim's blood.  On this record, the evidence was sufficient to prove that the fentanyl Appellant delivered to the victim was a direct and substantial factor in producing the victim's death even though other factors combined to achieve the result.  *See Proctor, supra*; *Kakhankham, supra*.

In Appellant's final issue, he argues that the verdict was contrary to the weight of the evidence.  Specifically, he insists that the evidence established

that the victim, Zink, Gemmill and Appellant were co-purchasers of the drugs for personal use and, as co-purchasers, they could not make a delivery or transfer among themselves. Again, Appellant argues that he simply could not have delivered the drugs where they were jointly possessed among the parties, and therefore the verdict on all counts was contrary to the weight of the evidence.[7] We disagree.

Our standard of review regarding challenges to the weight of the evidence is as follows:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the … verdict if it is so contrary to the evidence as to shock one's sense of justice.
>
> **_Commonwealth v. Small_**, 559 Pa. 423, [435,] 741 A.2d 666, 672-73 (1999). Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

**_Commonwealth v. Champney_**, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003), _cert denied_, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (most internal citations omitted).

Here, the trial court addressed Appellant's issue in its Rule 1925(a)

---

[7] Appellant preserved his challenge to the weight of the evidence in his timely-filed post-sentence motion. **_See_** Pa.R.Crim.P. 607(A)(3).

opinion as follows:

> In the instant case, [Appellant's] contentions in regard to the weight of the evidence are the same as his contentions in regard to the sufficiency of the evidence. For the reasons set forth above in regard to the sufficiency of the evidence, these contentions are without merit. The jury's verdicts of guilty were based on direct and circumstantial evidence, which was sufficient to find [Appellant] guilty of all those offenses beyond a reasonable doubt. Because the jury's verdicts are not contrary to the evidence and do not shock the conscience of the Court, a new trial is not warranted.

(Trial Court Opinion, 2/21/24, at 13).

The jury as factfinder was free to believe all, part, or none of the evidence presented. *See Champney, supra*. Here, the jury found that Appellant supplying $100.00 for the purchase of drugs and then cutting the drugs into lines for everyone to ingest constituted delivery of the drugs. The trial court denied Appellant's post-sentence motion for a new trial, explaining that the jury's verdict was not so contrary to the evidence as to shock the conscience. *See id.* On this record, we cannot say that the trial court abused its discretion in denying Appellant's weight claim. Appellant's final issue is meritless. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/17/2025